**EASTMAN KODAK COMPANY,**
**Plaintiff–Counterclaim**
**Defendant,**

v.

**STWB INC., formerly Sterling Winthrop Inc.; and Bayer Corp., formerly Miles Inc. Defendants–Counterclaim Plaintiffs.**

**No. 01 Civ. 5124 (JGK).**

United States District Court,
S.D. New York.

Oct. 19, 2002.

---

Richard H. Klapper, Sharon L. Nelles, Sullivan & Cromwell, New York City, for Plaintiff.

Robert H. Baron, Cravath, Swaine & Moore, New York City, for Defendants.

## OPINION AND ORDER

KOELTL, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case concerns the alleged obligation of the plaintiff and counterclaim defendant

Eastman Kodak Company ("Kodak") to indemnify the defendant and counterclaim plaintiff Bayer Corp. ("Bayer") for certain employee retirement obligations of Kodak's former subsidiary, the defendant and counterclaim plaintiff STWB, Inc., formerly Sterling Winthrop Inc. ("Sterling"). The Court conducted a non-jury trial on September 3, 9, and 10, 2002. Having heard the testimony of the witnesses, and having assessed their credibility and having reviewed the documentary evidence, the Court makes the following findings of fact and reaches the following conclusions of law pursuant to Fed.R.Civ.P. 52.

## FINDINGS OF FACT

### The Parties

1. Kodak is a corporation organized and existing under the laws of the State of New Jersey and has its principal place of business at 343 State Street, Rochester, New York 14650. (Am. Joint Pretrial Order, Stipulations of Fact ("Stip.Fact") ¶ 1.)

2. Sterling is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. From September 18, 1991 to September 16, 1996, Sterling operated under the name Sterling Winthrop Inc.(Stip. Fact ¶ 2.)

3. Bayer is a corporation organized and existing under the laws of the State of Indiana and has its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. Bayer is a wholly-owned subsidiary of Bayer, AG, a German corporation. From January 1, 1992 to April 3, 1995, Bayer operated under the name Miles Inc. (Stip. Fact ¶ 3.)

### Background

4. In or about March or April 1994, Kodak decided to divest its wholly-owned subsidiary Sterling, which was involved in the research, development, manufacture and sale of, among other things, consumer products, consumer health products and pharmaceuticals. (Stip. Fact ¶¶ 4, 5; Tr. at 58 (Mabon).)

5. At that time, Sterling was comprised of three business groups—Pharmaceuticals, Lehn & Fink ("L & F") and Consumer Health—and a corporate headquarters group that provided services to those business groups. (DX–7 at EKC 003024; Tr. at 58–9 (Mabon); Tr. at 110–11 (Pollack).)

6. In June 1994, Kodak and Sterling entered into an agreement (the "Asset Purchase Agreement") with Sanofi S.A. ("Sanofi") to transfer to Sanofi certain assets and liabilities of Sterling's ethical or prescription pharmaceutical business, which was comprised of portions of several internal divisions of its Pharmaceuticals business. (PX–1; Tr. at 60–61 (Mabon); Tr. at 108, 114 (Pollack).)

7. In late August 1994, Kodak entered into an agreement (the "Stock Purchase Agreement") with SmithKline Beecham plc ("SmithKline") to sell all of the issued and outstanding shares of Sterling common stock. (Stip. Fact ¶ 9; PX–4 at EKC 005826 (Recitals), PX–4 at EKC 005838 (Section 2.1).) Kodak sold the shares of Sterling to SmithKline for an aggregate purchase price of $2,925,000,000. (*Id.*)

8. In October 1994, Kodak transferred all of the assets and liabilities of the L & F business out of Sterling. (PX–7 at EKC 003668 (Recitals).) The L & F business included the production of household products such as Lysol and rug cleaner. (Tr. at 58—59 (Mabon).)

9. By entering into these transactions, Kodak intended to divest itself of responsibility for Sterling and its liabilities (Tr. at 59 (Mabon); Tr. at 113, 197 (Pollack).), and structured the Asset Purchase Agreement

and the transfer of the L & F assets and liabilities such that Sterling liabilities were either explicitly transferred to the counterparty, retained by Sterling, or explicitly retained or indemnified by Kodak (PX–1 at EKC 005303—005312 (Sections 2.1, 2.2, 2.3 and 2.4); PX–7 at EKC 003681—003689 (Sections 2.1, 2.2, 2.3 and 2.4); DX–14 at B 00003294—00003303 (Sections 2.1, 2.2, 2.3 and 2.4); Tr. at 118–20 (Pollack); Tr. at 255–56 (Doolittle)).

### The Agreement with Sanofi

10. On June 22, 1994, Kodak, Sterling and Sanofi entered into the Asset Purchase Agreement, which was subsequently amended and restated on September 30, 1994. (Stip. Fact ¶¶ 7; PX–1; PX–8.) The provisions of the Asset Purchase Agreement that were amended or restated are not relevant to this dispute. (Stip. Fact ¶ 18.)

11. The Asset Purchase Agreement was structured such that specified assets and liabilities of Sterling's ethical or prescription pharmaceutical group were transferred to Sanofi, and the remaining assets and liabilities were retained by Sterling. (Tr. at 118–20 (Pollack); Tr. at 255–56 (Doolittle).) The Asset Purchase Agreement defined the assets and liabilities transferred to Sanofi as "Transferred Assets" and "Assumed Liabilities," and the assets and liabilities retained by Sterling as "Excluded Assets" and "Excluded Liabilities". (PX–1 at EKC 005303—005312 (Sections 2.1, 2.2, 2.3 and 2.4).)

12. Kodak, Sterling and Sanofi extensively negotiated the terms of the Asset Purchase Agreement, including the allocation of expenses for benefits owed to Sterling's retired employees ("retiree benefit expenses"). (Tr. at 222–26 (Alpern); Tr. at 116–17, 120–23 (Pollack).)

13. Historically, Sterling allocated its retiree benefit expenses as a corporate headquarters liability, although an allocation was made as of December 31, 1993 that allocated such expenses to the Consumer Health, the Pharmaceutical Group, and Corporate based on the active United States headcount for those groups. (PX–1 at B 003165—003166; PX–4 at EKC 005984—005985; DX–8 at EKC 002683—002684; Tr. at 327–28, 336–37 (Gomez–Nieto).) In order to apportion a percentage of those corporate headquarters liabilities to Sanofi, the parties to the Asset Purchase Agreement considered allocating the retiree benefit expenses by attempting to determine the number of former employees who had worked for the portion of the ethical pharmaceuticals business which was transferred to Sanofi. The parties concluded that such an allocation was neither practical nor possible. (Tr. at 224—25 (Alpern); Tr. at 258–59 (Doolittle).) Many of Sterling's former employees had worked for more than one division or corporation function during the course of their employment. (Tr. at 224–25 (Alpern); Tr. at 121–22 (Pollack); Tr. at 259 (Doolittle); Tr. at 322–24 (Gomez–Nieto).) Moreover, Sterling had only began to keep records during the last five years or so as to the particular business within Sterling an employee was working for at the time of his or her retirement. (Tr. at 224 (Alpern); Tr. at 258–59 (Doolittle).)

14. Sanofi, Sterling and Kodak agreed to allocate the retiree benefit expenses between Sterling and Sanofi using formulas that relied on distributions and calculations of active, not retired, employees. (PX–1 at EKC 005393—005394 (Section 5.5(g)); PX–1 at EXC 005396—005397 (Section 5.5(k));Tr. at 226–27, 230 (Alpern); Tr. at 122 (Pollack).)

15. Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement set forth the terms of the parties' agreement with respect to the allocation of retiree benefit

expenses. (PX–1 at EKC 005393—005394 (Section 5.5(g)); PX–1 at EXC 005396—005397 (Section 5.5(k)).) Pursuant to those sections, Sterling and Sanofi are each responsible for the administration of a different set of benefit plans for Sterling's former employees. Sterling and Sanofi are each required to advance the total costs of benefits payable under the plans it administers, and each is to be reimbursed by the other for a certain percentage share of those costs. (Stip. Fact ¶ 12); (PX–1 at EKC 005393—005394 (Section 5.5(g)); PX–1 at EXC 005396—005397 (Section 5.5(k)).)

16. Pursuant to Section 5.5(g) of the Asset Purchase Agreement, Sterling is responsible for administering the following Sterling retiree benefit plans: (i) Sterling Winthrop Inc. Supplemental Executive Retirement Plan ("SERP"); (ii) Sterling Winthrop Inc. Deferred Compensation Plan ("DCP"); (iii) Sterling Winthrop Inc. Supplemental Retirement Benefit Plan ("SRBP"); (iv) Individual Pension Agreements as set forth on Exhibit A to Schedule 3.10(a) of the Asset Purchase Agreement ("Individual Pensions"); (v) Sterling Winthrop Inc. Foreign Service Pension Plan ("FSPP"); and (vi) Sterling Winthrop Inc. Severance Benefits Plan ("SBP"), (collectively, excluding the FSPP, the "Schedule 5.5(g) Plans"). (Stip. Fact ¶ 13; PX–1 at EKC 005393—005394 (Section 5.5(g)); PX–1 at B 003271 (Schedule 5.5(g)).) The parties do not dispute the allocation of expenses for the FSPP, the DCP, or the SERP. (Stip. Fact ¶ 13.)

17. Pursuant to Section 5.5(k) of the Asset Purchase Agreement, Sanofi is responsible for administering the following Sterling retiree benefit plans: (i) Sterling Winthrop Inc. Group Insurance Plan for Salaried Employees–Retiree Medical Plan; (ii) Sterling Winthrop Inc. Group Insurance Plan for Hourly Employees–Retiree Medical Plan; (iii) Sterling Winthrop Inc. Life Insurance Plan for Salaried Employees–Retiree Life Insurance Plan; (iv) the Sterling Winthrop Inc. Life Insurance Plan for Hourly Employees–Retiree Life Insurance Plan; and (v) the Sterling Winthrop Inc. Group Insurance Plan for its Employees in Puerto Rico–Retiree Medical Insurance Plan (collectively, the "Retiree Welfare Plans"). (Stip. Fact ¶ 14; PX–1 at EKC 005395—005397 (Section 5.5(k)).)

18. Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement provide express formulas (the "expense allocation formulas") for calculating Sanofi's and Sterling's respective percentage shares of expenses for the retiree benefit plans. (PX–1 at EKC 005393—005394 (Section 5.5(g)); PX–1 at EKC 005395—005397 (Section 5.5(k)).)

19. Pursuant to the expense allocation formulas, the total amount advanced by each party is multiplied by a headcount fraction. Sanofi's share of the retiree benefit expenses is capped at 70% of the total cost of benefits payable to former employees of Sterling under the relevant plans, except for Sanofi's share of FSPP expenses which is capped at 46% (Stip. Fact ¶ 17; PX–1 at EKC 005393—005394 (Section 5.5(g)); PX–1 at EKC 005395—005397 (Section 5.5(k)).)

20. Section 5.5(g) of the Asset Purchase Agreement requires Sanofi to pay to Sterling:

> in accordance with [Sterling's] statement of the estimated annual cost of the employee benefits and deferred compensation payable to the Former Employees under the plans and arrangements listed on Schedule 5.5(g), an amount equal to the result of multiplying one fourth of such annual cost for each such plan or arrangement by the fraction, the numerator of which is equal to the number of U.S. Transferred Employees of the

Business on the Closing Date, and the denominator of which is equal to the number of U.S. active employees of [Sterling] and all of its subsidiaries on the Closing Date.

(PX–1 at EKC 005393—005394.)

21. Section 5.5(k)(ii) of the Asset Purchase Agreement requires Sterling to pay Sanofi:

in accordance with [Sanofi's] statement of the estimated annual cost of the benefits under the Retiree Welfare Plans payable with respect to the Retiree Welfare Plan Participants, an amount equal to the result of multiplying (A) one fourth of such annual cost by (B) one minus a fraction, the numerator of which is equal to the number of U.S. Transferred Employees of the Business on the Closing Date, and the denominator of which is equal to the number of U.S. active employees of [Sterling] and all of its subsidiaries on the Closing Date.

(PX–1 at EKC 005396—005397.)

22. Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement expressly require that the headcount fraction denominator include employees of all Sterling businesses if, on the closing date of the Asset Purchase Agreement, they were active employees of Sterling. (PX–1 at EKC 005393—005394 (Section 5.5(g)); PX–1 at EKC 005395—005397 (Section 5.5(k)).)

23. The Asset Purchase Agreement closed on October 1, 1994. (Stip. Fact ¶ 8.)

24. Sterling's L & F business, including its U.S. active employees, was not transferred out of Sterling before the Asset Purchase Agreement closed. (Stip. Fact ¶ 20.) Neither the Asset Purchase Agreement nor the Stock Purchase Agreement required that the L & F business be transferred out of Sterling before the closing of the Asset Purchase Agreement, and no party requested that the transfer occur

before the closing of the Asset Purchase Agreement. (PX–1; PX–4 at EKC 005825—005826 (Recitals); PX–4 at EKC 005843—005844 (Section 2.3); PX–4 at EKC 005918—005919 (Section 5.9(g)); PX–5 at EKC 006115 (Recitals); Tr. at 126–28, 134–35 (Pollack).) However, had the L & F business been transferred out of Sterling prior to the closing of the Asset Purchase Agreement, L & F employees would not have been included in the headcount of active Sterling U.S. employees, consequently, would not have been included in the denominator of the headcount fraction. As a result of the way in which the reimbursement formulas worked, this would have increased Sanofi's share of costs for the various retiree benefit plans.

25. Sections 2.3(e) and 2.4(h) of the Asset Purchase Agreement expressly define Sterling's share of certain retiree expenses under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement as an "Excluded Liability" retained by Sterling that is not transferred to Sanofi. (PX–1 at EKC 005310 (Section 2.3(e)(i)); PX–1 at EKC 005312 (Section 2.4(h)).)

*The Sale of Sterling—Due Diligence*

26. In or about late June 1994, Kodak invited selected bidders, including Bayer and SmithKline, to participate in detailed due diligence with respect to the proposed sale of all the issued and outstanding shares of Sterling common stock. (Tr. at 68–70 (Mabon); Tr. at 136–37 (Pollack); Tr. at 261 (Doolittle).) As part of the due diligence process, these bidders were provided an opportunity to review the prior Asset Purchase Agreement between Sterling and Sanofi. (Tr. at 70 (Mabon); Tr. at 137(Pollack); Tr. at 261–62 (Doolittle).)

27. Bayer reviewed the Asset Purchase Agreement on or about August 1, 1994, and recorded its terms for later review.

(Tr. at 136–38 (Pollack); Tr. at 261–62 (Doolittle).)

28. Kodak also conducted management presentations for those bidders, including Bayer, who were invited to participate in the due diligence process. (Tr. at 68 (Mabon); Tr. at 136–37 (Pollack); Tr. at 260–61 (Doolittle).) At these presentations, representatives of Kodak explained to the bidders that any sale of Sterling would be subject to the Asset Purchase Agreement. (Tr. at 70–71 (Mabon).)

29. Bayer then submitted a formal bid to buy Sterling. (Tr. at 71 (Mabon); Tr. at 263 (Doolittle).)

*The Sale of Sterling—SmithKline*

30. Kodak offered SmithKline the opportunity in August 1994 to bid for Sterling, and in late August 1994 Kodak agreed to negotiate the sale of Sterling to Smith-Kline. (Tr. at 71–72 (Mabon); Tr. at 263–64 (Doolittle).) Representatives of Kodak and SmithKline actively negotiated the terms of the sale over a one to two week period in late August 1994. (Tr. at 72 (Mabon); Tr. at 139 (Pollack); Tr. at 264 (Doolittle).) Bayer did not participate in those negotiations. (Tr. at 81 (Mabon); Tr. at 158 (Pollack); Tr. at 275–76 (Doolittle).) During the negotiation process, Kodak provided SmithKline with a copy of the Asset Purchase Agreement. (Tr. at 141 (Pollack).) A constant theme of the negotiations was that SmithKline would be buying Sterling subject to the terms of the Asset Purchase Agreement. (Tr. at 141–42 (Pollack); Tr. at 266–67 (Doolittle).)

31. Kodak, SmithKline and 343 Holding Corp. (a subsidiary of Kodak) entered into a stock purchase agreement dated as of August 28, 1994 (the "Stock Purchase Agreement"), by which Kodak sold and transferred to SmithKline all of the issued and outstanding shares of Sterling. (Stip.

Fact ¶ 9; PX–4 at EKC 005826 (Recitals); PX–4 at EKC 005838 (Section 2.1).)

32. The Stock Purchase Agreement expressly acknowledges that SmithKline's purchase of Sterling was subject to the Asset Purchase Agreement. (PX–4 at EKC 005825 (Recitals); PX–4 at EKC 005881—005884 (Section 5.3); PX–4 at EKC 005914—005924 (Section 5.9); PX–4 at EKC 005925 (Section 5.11).) Smith-Kline also explicitly agreed to "cause Sterling and its Subsidiaries to perform their obligations" under the Asset Purchase Agreement. (PX–4 at EKC 005917 (Section 5.9(c)).) Recognizing SmithKline's obligation to cause Sterling to perform these obligations, Kodak agreed to obtain Smith-Kline's consent before amending the Asset Purchase Agreement to "impose material liabilities or obligations on Sterling," and also agreed to indemnify SmithKline if necessary to obtain such consent. (*Id.*)

33. The Stock Purchase Agreement did not require that Kodak transfer the assets and liabilities of the L & F business from Sterling before the closing of the Asset Purchase Agreement. (PX–4 at EKC 005825—005826 (Recitals); PX–4 at EKC 005918—005919 (Section 5.9(g)).) Rather, the parties agreed that Kodak would cause Sterling to sell the L & F business or transfer the assets and liabilities of the L & F business from Sterling prior to the closing of the Stock Purchase Agreement. (*Id.*) The Stock Purchase Agreement was not scheduled to close until at least ten business days after the Asset Purchase Agreement closed. (PX–4 at EKC 005843—005844 (Section 2.3).)

34. On August 8, 1994, Kodak proposed a series of amendments to the Asset Purchase Agreement. (Tr. at 129–133 (Pollack).) Among those amendments was a request that Sanofi agree to amend the expense allocation formulas set forth in Sections 5.5(g) and 5.5(k) of the Asset Pur-

chase Agreement to exclude active L & F employees from the headcount fractions for the retiree benefit plans in which those employees did not participate. (PX–19 at B 000728; PX–19 at B 000733—000737; Tr. at 233 (Alpern).) The net effect of such an amendment would have been to increase Sanofi's share of expenses for employee retirement benefits. (Tr. at 131 (Pollack).) On September 15, 1994, Sanofi formally rejected Kodak's proposed amendment. (PX–19 at B 000768; Tr. at 235 (Alpern); Tr. at 131, 133–34 (Pollack).) On September 18, 1994, counsel for Kodak informed counsel for SmithKline and Bayer that Sanofi would not agree to amend the expense allocation formulas. (PX–19 at B 000768; Tr. at 236 (Alpern).)

35. As of September 26, 1994, Kodak, L & F Products Inc., Sterling and Reckitt & Colman, PLC ("Reckitt & Colman") entered into an asset purchase agreement, pursuant to which Sterling agreed to transfer to Reckitt & Colman certain assets and liabilities of Sterling's L & F household products business. (Stip. Fact ¶ 15; PX–7.) Sterling agreed to remain responsible for retiree benefit expenses payable under the SERP, DCP and FSPP plans. (PX–7 at EKC 003762—003763 (Section 5.5(h)).) Reckitt & Colman agreed to pay Sterling a specified percentage share of the retiree benefit expenses of Sterling's SERP, DCP and FSPP plans. (Stip. Fact ¶ 15; PX–7 at EKC 003762—003763 (Section 5.5(h)).) The expense allocation formula used to calculate Reckitt and Colman's share of the retiree benefit expenses under those plans is, like the expense allocation formulas set forth in Section 5.5(g) and 5.5(k) of the Asset Purchase Agreement, based on a headcount fraction, where the denominator is the number of U.S. active employees of Sterling as of the date of the closing of the Asset Purchase Agreement. (PX–7 at EKC 003762—003763 (Section 5.5(h)).)

36. As of October 30, 1994, Kodak, L & F Products Inc. and SmithKline amended the Stock Purchase Agreement to add, among other changes, a Section 5.5(g). (Stip. Fact ¶ 16; PX–41 at B 001113—001114 (Section 2.4).) Pursuant to this Section 5.5(g), Sterling agreed to remain responsible for amounts payable under the SERP, DCP and FSPP plans. (PX–41 at B 001113—001114 (Section 2.4).) Kodak agreed to pay Sterling a specified percentage share of Sterling's SERP, DCP and FSPP expenses. (*Id.*) The expense allocation formula used to calculate Kodak's percentage share of these retiree benefit expenses under these plans is, like the expense allocation formulas set forth in Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement, based on a headcount fraction, where the denominator is the number of U.S. active employees as of the date of the closing of the Asset Purchase Agreement. (*Id.*)

37. The negotiations of the amendment to the Stock Purchase Agreement occurred after the closing of the Asset Purchase Agreement. (Stip. Fact ¶ 8, 16; Tr. at 238 (Alpern).) During these negotiations, SmithKline and Bayer, which were both then aware that Sanofi had rejected Kodak's request to amend the retiree benefit expense allocation formulas in the Asset Purchase Agreement, did not request any amendment that would obligate Kodak to pay any portion of Sterling's retiree benefit liabilities for retiree benefit plans in which active L & F employees did not participate. (Tr. at 165 (Pollack); Tr. at 239–40 (Alpern).)

38. The Stock Purchase Agreement closed on October 31, 1994. (Stip. Fact ¶ 9.)

*The Sale of Sterling—Bayer*

39. SmithKline and Bayer entered into an agreement as of September 11, 1994

(the "Bayer Agreement"), whereby Smith-Kline agreed to transfer to Bayer all of Sterling's common stock after Sterling sold to SmithKline assets relating to Sterling's businesses outside North America, and whereby SmithKline agreed to assume the liabilities relating to these businesses. (Stip. Fact ¶ 10; PX–5 at EKC 006116 (Recitals); PX–5 at EKC 006130—006131 (Section 2.1); PX–5 at EKC 006233 (Section 6.1(e)); Tr. at 160–61 (Pollack).)

40. Also as of September 11, 1994, SmithKline, Bayer and Kodak entered into a letter agreement (the "Letter Agreement"), pursuant to which Bayer agreed "to be bound by those obligations in the . . . Stock Purchase Agreement that will be assumed by [Bayer] pursuant to the executed [Bayer Agreement]." (PX–6 at EKC 006286; Stip. Fact ¶ 11.) Those assumed obligations included SmithKline's obligation to cause Sterling to perform its obligations under the Asset Purchase Agreement. (PX–5 at EKC 006214—006215 (Section 5.9(a)); PX–5 at EKC 006225 (Section 5.19).)

41. In the Recitals to the Bayer Agreement, Bayer acknowledged that Kodak and Sterling had agreed to transfer the L & F business before the closing of the Stock Purchase Agreement. (PX–5 at EKC 006115 (Recitals).) However, the Bayer Agreement does not recite that Kodak and Sterling had agreed to transfer the L & F business before the closing of the Asset Purchase Agreement. (Id.)

42. Bayer now points out that had the L & F transfer occurred before the closing of the Asset Purchase Agreement, the L & F employees would not have been included in the headcount of active U.S. Sterling employees at that time, the amount of retiree benefits to be paid by Sanofi would have been increased as a result of the application of the formulas in Section 5.5(g) and 5.5(k) of the Asset Purchase Agreement, and therefore the amount of such benefits to be paid by Sterling and the liability that would have been assumed by SmithKline when it purchased the Sterling stock would have decreased. However, at the time the Asset Purchase Agreement was executed in June, 1994, Kodak did not know whether the L & F transfer would occur before or after the closing of the Asset Purchase Agreement. (Tr. At 172 (Pollack); Tr. at 66–67 (Mabon); Tr. at 231 (Alpern).) The Stock Purchase Agreement was not conditioned on the transfer of the L & F business prior to the closing of the Asset Purchase Agreement. Moreover, the Bayer Agreement recited that the L & F business was to be transferred before the closing of the Stock Purchase Agreement, but did not recite that it was to be transferred before the closing of the Asset Purchase Agreement. While Kodak informed SmithKline and Bayer in September, 1994 before the closing of the Stock Purchase Agreement and the Bayer Agreement, that Sanofi had not agreed to amend the Asset Purchase Agreement to exclude the active L & F employees from the headcount calculation of retiree benefits in the Asset Purchase Agreement, neither the Stock Purchase Agreement nor the Bayer Agreement are conditioned on any change in the calculation of retirement benefits in the Asset Purchase Agreement or on any assumption of any such liability by Kodak. (PX–19 at B000768; Tr. at 129—34 (Pollack); 232—36 (Alpern).)

*The Balance Sheets*

43. In connection with Kodak's efforts to sell Sterling, Goldman Sachs & Co., on behalf of Kodak, prepared and transmitted to prospective purchasers Confidential Offering Memoranda regarding Sterling and its various businesses (Stip. Fact ¶ 6.) One such Memorandum dated May 1994 describes the Consumer Health Group that

was eventually acquired by SmithKline. (DX–7.) This Memorandum provides a detailed description of the worldwide business and assets of the Consumer Health Group. Included in the Financial Summary of the Consumer Health Group is a note to the Financial Statements which sates: "Post retirement health benefits are provided for U.S. employees of Sterling Winthrop Inc. and related expenses are reflected in the Income Statements. Sterling Health's share of the related liability as calculated according to FAS 106 is included in the Balance Sheet. As of December 31, 1993, the liability for post retirement health benefits was $29.6 million." (DX–7 at EKC 003121.) This calculation was based on the work of Juan Gomez–Nieto. (Tr. at 329–30 (Gomez–Nieto).) The calculations and Offering Memoranda were prepared prior to negotiation of the Asset Purchase Agreement. (Tr. at 261 (Doolittle); Tr. at 135 (Pollack).).

44. At the time Kodak decided to divest Sterling Mr. Gomez–Nieto, an employee of Sterling, was given the task of creating pro forma balance sheets allocating liabilities kept on Sterling's corporate headquarters books—particularly employee benefit liabilities—to Sterling's operating units. (Tr. at 326–29 (Gomez–Nieto).) When creating those balance sheets, Mr. Gomez–Nieto allocated a portion of Sterling's retiree benefit liabilities to the Pharmaceutical business group, and allocated the remainder of those liabilities to Sterling's Consumer Health group and its corporate headquarters. (PX–43 at B 001826—001827.)

45. The estimated liability for retirement benefits for retired Sterling employees as of December 31, 1993, was $76.5 million. (PX–43 at B 001830; Tr. at 351–52 (Gomez–Nieto).) To allocate a portion of the $76.5 million liability as of December 31, 1993 to the Pharmaceutical group,

Mr. Gomez–Nieto multiplied that liability by 69.5%, which was the percentage of active Sterling employees attributed to the Pharmaceutical group in December 1993. (PX–43 at B 001826; Tr. at 352–53 (Gomez–Nieto).) Mr. Gomez–Nieto allocated the remaining 30.5% of the $76.5 million liability for retiree benefits as of December 31, 1993 to Sterling's Consumer Health group (22.8% or $ 29.6 million) and to its Corporate Headquarters (7.7% or $10.0 million). (PX–43 at B 001826.)

46. These allocations of post-retirement benefits were included in the pro forma financial statements shown to prospective purchasers of Sterling. (Tr. at 333 (Gomez–Nieto).) Sanofi, however, which was only purchasing certain assets and liabilities of the Pharmaceuticals group, initially refused to assume any liability for Sterling's retiree benefit liabilities. (Tr. at 222 (Alpern); Tr. at 257–58 (Doolittle).) Ultimately, Sanofi agreed to assume a percentage share of Sterling's retiree benefit liabilities. As a result of those negotiations, pursuant to the expense allocation formulas set forth in Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement, Sanofi assumed 47.06% of Sterling's retiree benefit liabilities, not the full 69.5% of those liabilities. (Stip. Fact ¶¶ 21, 22.)

47. A pro forma balance sheet for the Consumer Health group continuing business, reflecting what SmithKline was acquiring pursuant to the Stock Purchase Agreement is annexed to the Stock Purchase Agreement. (PX–4 at EKC 005982 (Schedule 3.8); Tr. at 94 (Mabon); Tr. at 166–68 (Pollack).) That balance sheet reflects the allocation of retiree benefit liabilities initially prepared by Mr. Gomez–Nieto, and was not updated either at the time the Stock Purchase Agreement was entered into or before the closing of the Stock Purchase Agreement so as to reflect

the retiree benefit expense allocation formulas agreed to by Kodak, Sterling and Sanofi in the Asset Purchase Agreement. (Tr. at 346 (Gomez–Nieto).)

48. Had the pro forma balance sheet for the Consumer Health group continuing business been adjusted to reflect the difference between the percentage share allocated to the Consumer Health group and corporate headquarters pursuant to the allocation formulas developed by Mr. Gomez–Nieto and the actual percentage share allocated to Sterling pursuant to the terms of the Asset Purchase Agreement, the amount of Sterling's liability would have increased by less than $20 million. (Tr. at 357 (Gomez–Nieto).) That amount is substantially less than 1% of the $2,925,000,000 purchase price of the shares of Sterling paid by SmithKline to Kodak pursuant to the Stock Purchase Agreement. (*See* PX–4 at EKC 005838 (Section 2.1).)

*The Retiree Benefits Disputes*

49. Despite the fact that the Asset Purchase Agreement sets forth specific expense allocation formulas for calculating Sanofi's and Sterling's percentage shares of retiree benefit expenses, Sterling has failed to calculate those percentage shares as required by the expense allocation formulas. (Stip. Fact ¶¶ 21, 22; PX–24; PX–26; PX–34 at EKC 006766, EKC 006778; PX–33 at EKC 005126—005127, 005147—005148.)

50. Instead, Sterling excludes L & F employees from the denominator of the headcount fraction when calculating Sterling's, Sanofi's and Kodak's share of retiree benefit expenses for the Individual Pensions, SBP, SRBP, and the Retiree Welfare Plans. Sterling also includes temporary employees in the numerator and denominator of the headcount fraction when allocating retiree benefit expenses

for the Schedule 5.5(g) Plans and the Retiree Welfare Plans. (PX–24; PX–26; Day 2 Tr. at 278 (Doolittle).)

51. Sanofi follows the expense allocation formulas in the Asset Purchase Agreement when calculating its and Sterling's respective percentage share of retiree benefit expenses. (Stip. Fact ¶¶ 21, 22; PX–24; PX–33 at EKC 004876, EKC 005228; PX–34 at EKC 006767.)

52. Pursuant to the expense allocation formula set forth in Section 5.5(g) of the Asset Purchase Agreement, Sanofi is required to reimburse Sterling for 47.06% of the amounts Sterling advances as administrator of the Schedule 5.5(g) plans. (Stip. Fact ¶ 21.)

53. Pursuant to the expense allocation formula set forth in Section 5.5(k) of the Asset Purchase Agreement, Sterling is required to reimburse Sanofi for 52.94% of the amounts Sanofi advances as administrator of the Retiree Welfare Plans. (Stip. Fact ¶ 22.)

54. Sanofi calculates Sterling's net share of retiree benefit expenses by deducting Sanofi's share of retiree benefit expenses payable under Section 5.5(g) from Sterling's share of retiree benefit expenses payable under Section 5.5(k). Sterling's net share of retiree benefit expenses for the fourth quarter 1994 through the fourth quarter 2001, as calculated by Sanofi, is $20,024,758. (Stip. Fact ¶ 24.)

55. Through March 1996, Sterling paid $2,059,573 to Sanofi, and Sanofi paid $1,824,211 to Sterling for retiree benefit expenses arising under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement. Since then, neither Sanofi nor Sterling has made any payment to the other for retiree benefit expenses. (See Stip. Fact ¶ 25.)

56. The reimbursable amounts owed by Sterling to Sanofi are substantially larger

than the amounts Sanofi owes to Sterling. (Stip. Fact ¶ 24.)

57. Through the fourth quarter of 2001, Sanofi has demanded that Sterling pay $19,789,396, exclusive of interest. As calculated by Sanofi, this sum represents the amounts Sterling owes to Sanofi for Sterling's net share of retiree benefit expenses, after deducting the amounts paid by Sterling to Sanofi and adding the amounts paid by Sanofi to Sterling. (Stip. Fact ¶ 26.)

58. Sterling has refused to pay this amount. (Stip. Fact ¶ 25; Tr. at 349 (Gomez–Nieto).)

59. Bayer and Sterling do not now contest that temporary employees should be excluded from the headcount fraction of the expense allocation formulas set forth in Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement and Section 5.5(g) of the Amendment to the Stock Purchase Agreement. (Am. Joint Pretrial Order, Defs.' Statement of Defenses at 4–5.) Sterling nonetheless included temporary help in the headcount fraction from the fourth quarter 1994 through the fourth quarter 2001, and thereby improperly increased the amounts supposedly owed by Sanofi to Sterling. (PX–26; PX33; PX–34; Tr. at 278 (Doolittle).)

60. Pursuant to the Asset Purchase Agreement and an agreement dated February 14, 1996, between Kodak and Sanofi (the "Settlement Agreement"), Kodak agreed to indemnify Sanofi for any portion of Sterling's net share of retiree benefit expenses not paid by Sterling, as calculated by Sanofi. (Stip. Fact ¶ 27; PX–1; PX–11; Tr. at 279–80 (Doolittle).)

61. As required by Section 7.3 of the Asset Purchase Agreement and by the Settlement Agreement between Kodak and Sanofi dated February 14, 1996, Kodak has paid $19,789,396 to Sanofi in order to indemnify Sanofi for retiree benefit expenses Sanofi claims are due and owing from Sterling. (Stip. Fact ¶ 26; PX–1 at EKC 005429—005433 (Section 7.3); PX–11; Tr. at 280–82 (Doolittle).)

### The Indemnity Dispute

### Section 7.3(a)(ii) of the Stock Purchase Agreement

62. Bayer and Sterling have not contended at this stage of the litigation that Sterling was not obligated to make additional payments to Sanofi for retiree benefits. Rather, Bayer and Sterling contend that Kodak is not entitled to any relief because Kodak is contractually obligated, pursuant to Section 7.3(a)(ii) and 7.3(a)(v) of the Stock Purchase Agreement and the Letter Agreement, to indemnify Bayer and Sterling for the cost of retiree benefits paid to former employees of the Sterling pharmaceutical business that was sold to Sanofi. (*See* Am. Joint Pre–Trial Order at 4–5.)

63. Section 7.3(a)(ii) of the Stock Purchase Agreement provides that Kodak will indemnify SmithKline "from, against and in respect of any Losses imposed on, sustained, incurred or suffered by or asserted against [SmithKline or its Affiliates], directly or indirectly relating to or arising out of . . .":

any liability or expense of Sterling relating to, or arising out of, the Transferred Businesses or holding and operating any assets or liabilities which are to be part of the Transferred Business, or otherwise constituting a cost of the Restructuring (in each case to the extent not reimbursed by a third party), whether arising prior to or after the Closing, including any liability of Sterling relating to the Transferred Businesses listed in Schedule 7.3(a)(ii); *provided* that this Section 7.3(a)(ii) shall not apply to any liability to the extent that such liability

arises out of the breach by Purchaser of any covenant contained in Article V with respect to the Transferred Businesses or the breach by Sterling of [the Asset Purchase Agreement or other agreements relating to the Restructuring]. (PX–4 at EKC 005933—005934 (Section 7.3(a)).)

64. "Losses" is defined to include "any damages, claims, losses, charges, actions, suits, proceedings, deficiencies, Taxes, interest, penalties and reasonable costs and expenses . . . ." (PX–4 at EKC 5832, 5933.)

65. The Stock Purchase Agreement defines the "Transferred Businesses" as: "the entities, assets and liabilities to be transferred out of Sterling or its Affiliates or sold by [Kodak], Sterling or the Affiliates of either of them, in either case pursuant to the Restructuring." (PX–4 at EKC 005836 (Section 1.1).)

66. The Stock Purchase Agreement defines the "Restructuring" to include "the transactions contemplated by the [Asset] Purchase Agreement; and . . . the transfer or sale by Sterling of the L & F Transferred Business . . . ." (PX–4 at EKC 005834 (Section 1.1).)

67. The Asset Purchase Agreement defines the "Transferred Business" contemplated by that Agreement as "the portion of the [ethical pharmaceutical business] represented by the Transferred Assets and Assumed Liabilities." (PX–1 at EKC 005302 (Section 1.1).)

68. The text of Section 7.3(a)(ii), whose plain meaning interpretation is supported by the testimony of those involved in the transaction at the time, indicates that Section 7.3(a)(ii) imposes an obligation on Kodak to indemnify SmithKline for expenses relating to assets and liabilities transferred to the purchasers of Sterling's assets, and to keep Sterling and SmithKline whole against transfer taxes, other direct costs relating to the removal of Sterling's assets, and specifically negotiated other costs. (Tr. at 147–48, 186–88 (Pollack); Tr. at 78–79 (Mabon).) In particular, Kodak and SmithKline discussed during the negotiations of the language of Section 7.3(a)(ii) that this indemnity was intended to protect SmithKline from (i) liabilities arising from assets that were transferred out of Sterling as part of the restructuring; and (ii) liabilities arising from the process of transferring assets out of Sterling, such as, transfer taxes and liabilities associated with managing assets that were to be transferred out of Sterling but remained with Sterling due to regulatory constraints or contractual limitations on transfer. (Tr. at 147–48, 186–87 (Pollack).)

69. Schedule 7.3(a)(ii) to the Stock Purchase Agreement specifies the anticipated liabilities of Sterling to Sanofi for which SmithKline could seek indemnification. Sterling's liabilities to Sanofi under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement are not included on Schedule 7.3(a)(ii). (PX–4 at EKC 006106—006107.)

70. By its terms, Section 7.3(a)(ii) does not cover indemnification by Kodak to SmithKline for Sterling's share of expenses under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement, and the parties did not intend to provide such an indemnification (Tr. at 147–48, 186–89 (Pollack); Tr. at 78–79 (Mabon).)

71. In fact, Kodak and SmithKline negotiated a proviso to Section 7.3(a)(ii) expressly intended to make clear that Section 7.3(a)(ii) would not relieve Sterling of its obligations to perform under the Asset Purchase Agreement or relieve SmithKline of its obligations to cause Sterling to perform under the Asset Purchase Agreement. (PX–4 at EKC 005934 (Proviso to Section 7.3(a)(ii)); Tr. at 148–49, 152, 158 (Pollack); Tr. at 273–74 (Doolittle).) One

of Sterling's obligations under the Asset Purchase Agreement was to pay its share of retiree benefit expenses as calculated pursuant to Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement. Indeed, to read Section 7.3(a)(ii) as Bayer and Sterling suggest would read out of the Stock Purchase Agreement the requirement that SmithKline cause Sterling to perform under the Asset Purchase Agreement. It would make no sense for Kodak to negotiate a provision requiring Smith-Kline to cause Sterling to perform under the Asset Purchase Agreement (such as by paying its share of retiree benefits) and then to provide that Kodak would indemnify SmithKline if Sterling failed to perform that very obligation.

### Section 7.3(a)(v) of the Stock Purchase Agreement

72. Section 7.3(a)(v) of the Stock Purchase Agreement provides that Kodak will indemnify SmithKline for "any Indemnified Liability." (PX–4 at EKC 005935 (Section 7.3(a)(v)).)

73. "Indemnified Liability" is defined in of the Stock Purchase Agreement as: a liability of Sterling that neither arises out of nor is primarily related to (i) the Consumer Health Business, (ii) the activities relating to headquarters operations, corporate staff of Sterling and the Consumer Health Group staff ..., (iii) the assets and liabilities transferred to Sterling pursuant to the Restructuring, or (iv) the items listed on Schedule 5.13(a) [to the Stock Purchase Agreement].

(PX–4 at EKC 005830 (Section 1.1).)

74. "Consumer Health Business" is defined in the Stock Purchase Agreement as "the Consumer Health Group of Sterling as described in all material respects in the Confidential Offering Memorandum, dated May 1994, provided to [SmithKline]."

(PX–4 at EK 005828.) As discussed above, the Confidential Memorandum included a detailed description of the Consumer Health Group that included a financial summary. (Findings of Fact ¶ 43.)

75. Section 7.3(a)(v) was added to the Stock Purchase Agreement when Smith-Kline asked for an indemnity that essentially would be a mirror image of Section 7.3(a)(ii) and that would protect against unknown liabilities that were not intended to be assumed. (Tr. at 153–54 (Pollack).) Specifically, where Section 7.3(a)(ii) was intended to provide an indemnity for liabilities arising out of the assets and liabilities transferred out of Sterling, Section 7.3(a)(v) was intended to confirm that intent by providing that SmithKline would be indemnified for all liabilities other than those that remained with Sterling pursuant to the several restructuring agreements. (Id.)

76. When drafting the definition of "Indemnified Liability", Kodak and Smith-Kline intended to describe what was left with Sterling after all the restructuring transactions had been effected. (Tr. at 155–56 (Pollock); Tr. at 274–75 (Doolittle).) Kodak would provide indemnity for liabilities that did not arise out of or relate to any of the four subparts of the definition of "Indemnified Liability." (Tr. at 159 (Pollack).)

77. The first subpart of the definition of "Indemnified Liability"—Consumer Health Business—excluded from indemnification the remainder of Sterling's over-the-counter drug business which remained after removing the ethical or prescription drug business that was acquired by Sanofi. (Tr. at 155–56 (Pollack).) The second subpart of that definition—activities relating to headquarters operations, corporate staff and Consumer Health Group staff—excluded from indemnification corporate obli-

gations such as corporate debt and human resource liabilities. (Tr. at 157–58 (Pollack).)

78. Sterling's retained liability arising out of Sterling's obligations to its retired employees under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement is a liability of Sterling's Consumer Health Business, because the retained liability remained with that business under the terms of the Asset Purchase Agreement. (Tr. at 158–59 (Pollack); Day 2 Tr. at 272, 291 (Doolittle).) Bayer argues that the disputed retained retiree liability is not a liability of Sterling's Consumer Health Business, because the Confidential Memorandum that defines the Consumer Health Group only allocates $29.6 million of post-retirement health benefits, less than the amount actually allocated under the Asset Purchase Agreement. But that is not a reasonable interpretation of ·the indemnity provision. The Consumer Health Business is defined as "the Consumer Health Group of Sterling as described in all material respects in the Confidential Memorandum dated May 1994 . . . ." The Confidential Memorandum is being used as the source to define the business that has been purchased by SmithKline, and is not a separate representation as to the accuracy of the financial statements. There are in fact separate representations with respect to the financial statements. Moreover, the difference in the description of retiree benefits could not be considered a material variance in the description of the Consumer Health Group.

79. To the extent that Sterling's obligations to its retired employees were not transferred to Sanofi pursuant to Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement, those liabilities remained liabilities of Sterling's headquarters operations, just as other corporate debts and other corporate liabilities existing at the closing and retained by Sterling are liabilities of Sterling headquarters operations. (Tr. at 327–28, 336–37 (Gomez–Nieto); Tr. at 157–58 (Pollack).)

80. Section 7.3(a)(v) imposed an obligation on Kodak to indemnify SmithKline for liabilities that did not relate to what was part of Sterling after the restructuring and that the parties could not anticipate prior to entering into the Stock Purchase Agreement. (Tr. at 152–60 (Pollack); Tr. at 272–73, 290–91 (Doolittle); Tr. at 79–80 (Mabon).) SmithKline repeatedly stated that it sought the indemnity to cover unknown liabilities, rather than to relieve SmithKline or Sterling of the obligations imposed by the Asset Purchase Agreement or the Stock Purchase Agreement. (Tr. at 153–54, 156–58 (Pollack); Tr. at 272–75, 291 (Doolittle).) Section 7.3(a)(v) was not intended to expand the scope of the Section ·7.3(a)(ii) indemnity or limit SmithKline's obligation to cause Sterling to perform under the Asset Purchase Agreement. (Tr. at 156–58, 159–60 (Pollack).)

81. When drafting Section 7.3(a)(v), Kodak and SmithKline did not intend the provision to require Kodak to indemnify SmithKline for Sterling's share ˙of expenses under Sections 5.5(g) and 5.5(k) ˙of the Asset Purchase Agreement, or any other expense allocated to Sterling by the Asset Purchase Agreement or Stock Purchase Agreement. (Tr. at 153–55, 158 (Pollack); Tr. at 272–74, 290–91 (Doolittle).) Indeed, Section 7.3(a)(v) cannot reasonably be read to undermine the explicit obligation of SmithKline to cause Sterling to perform under the Asset Purchase Agreement.

*Section 7.3(a)(i)*

82. In the course of trial Bayer and Sterling suggested that the Balance Sheet

attached to the Stock Purchase Agreement was inaccurate because it failed accurately to reflect the amount of Sterling's liability for retiree benefit expenses under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement. However, the defendants' recourse was to seek indemnity under Section 7.3(a)(i) of the Stock Purchase Agreement for a breach of representation or warranty in the Stock Purchase Agreement. No such claim was made and the defendants have not attempted to show how they could meet the requirements of Section 7.3(a)(i) or Section 7.3(b) (any Losses under Section 7.3(a)(i) are limited to those that exceed $20,000,000.). (PX–4 at EKC 005936). Moreover, any such claim, which must be brought within 18 months is time-barred. (PX–4 at EKC 005931–005932 (Section 7.1).).

### Bayer's Indemnity Claims

83. Pursuant to the Bayer Agreement, SmithKline assigned to Bayer, and Bayer assumed, SmithKline's indemnification rights and obligations under Section 7.3 of the Stock Purchase Agreement. (PX–5 at EKC 006241—006242 (Section 7.4).) Kodak acknowledged in the Letter Agreement that Bayer's agreement to be bound by those obligations of the Stock Purchase Agreement which Bayer assumed was sufficient to cause the assignment of SmithKline's indemnification rights and obligations to Bayer. (PX–6 at EKC 006286.)

84. Pursuant to Sections 5.9(a) and 5.19 of the Bayer Agreement, Bayer agreed to cause Sterling to perform its obligations under the Asset Purchase Agreement. (PX–5 at EKC 006214—006215 (Section 5.9(a)); PX–5 at EKC 006225 (Section 5.19).)

85. In 1995 and 1996, Bayer submitted notices of claim to Kodak demanding that Kodak indemnify Sterling and Bayer for the difference between Sanofi's claimed share and Sterling's claimed share of retiree benefit expenses under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement. (PX–29; PX–31; PX–32; Tr. at 283 (Doolittle).)

86. The notices of claim submitted to Kodak by Bayer, dated June 16, 1995, August 14, 1995 and March 11, 1996, only requested indemnity under Section 7.3(a)(ii) of the Stock Purchase Agreement. (PX–29; PX–31; PX–32; Tr. at 284–86 (Doolittle).) In defendants' fifty-nine page Amended Answer and Counterclaims, dated October 19, 2001, Bayer and Sterling also relied solely only on Section 7.3(a)(ii) of the Stock Purchase Agreement, and on no other indemnity provision of the Stock Purchase Agreement. (Defs.' Am. Ans. and Countercls.) Bayer and Sterling never requested indemnity under Section 7.3(a)(v) of the Stock Purchase Agreement in any correspondence or dealings with Sanofi or Kodak until after they filed their counterclaims in this litigation. (Tr. at 287 (Doolittle).)

87. Kodak has not agreed to indemnify Sterling or Bayer for the amounts requested in the 1995 and 1996 notices of claim. (Tr. at 293 (Doolittle).)

## CONCLUSIONS OF LAW

### I.

### Jurisdiction and Governing Law

1. This Court has subject-matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because of the complete diversity of citizenship between the plaintiff and the defendants. The amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Pursuant to their express terms, the Asset Purchase Agreement, the Stock Purchase Agreement, the Bayer Agreement

and the Letter Agreement are governed by the laws of the State of New York.

### Breach of Contract

■ 3. Under New York law, a plaintiff must prove four elements to prevail on a breach of contract claim: "(1) the making of a contract, (2) plaintiff's performance of the contract, (3) defendant's breach of the contract and (4) damages suffered by the plaintiff." *Kreiss v. McCown DeLeeuw & Co.*, 37 F.Supp.2d 294, 298 (S.D.N.Y.1999); *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F.Supp. 1051, 1060 (S.D.N.Y.1996), *aff'd*, 108 F.3d 1369, 1997 WL 138112 (2d Cir. 1997) (table).

### Contract Interpretation

■ 4. Under New York law, "the essence of contract interpretation ... is to enforce a contract in accordance with the true expectations of the parties in light of the circumstances existing at the time of the formation of the contract." *VTech Holdings Ltd. v. Lucent Techs., Inc.*, 172 F.Supp.2d 435, 441 (S.D.N.Y.2001); *see Sunrise Mall Assocs. v. Import Alley of Sunrise Mall, Inc.*, 211 A.D.2d 711, 621 N.Y.S.2d 662, 663 (1995). "The tests to be applied [to determine intent] ... are common speech ... and the reasonable expectation and purpose of the ordinary businessperson in the factual context in which the terms of art and understanding are used, often also keyed to the level of business sophistication and acumen of the particular parties." *Uribe v. Merchants Bank of New York*, 91 N.Y.2d 336, 670 N.Y.S.2d 393, 693 N.E.2d 740, 743 (1998) (internal citation omitted).

■ 5. New York law requires a contract to be enforced according to the plain meaning of its clear and unambiguous terms so as to give effect to the intent of the parties. *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 634 N.Y.S.2d 669, 658 N.E.2d 715, 717 (1995); *see W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990).

■ 6. To the extent any ambiguity exists in the provisions of a contract, the meaning of the ambiguous provisions is a matter of fact for this Court to determine in its role as fact finder. *See Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir.1998); *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996). The meaning of the ambiguous provisions is then ascertained from the parties' intent, as evidenced by the acts and circumstances surrounding the execution of those contractual provisions. *Roberts v. Consolidated Rail Corp.*, 893 F.2d 21, 24–25 (2d Cir.1989); *see also Pantone, Inc. v. Esselte Letraset Ltd.*, 691 F.Supp. 768, 774 (S.D.N.Y.1988), *aff'd* 878 F.2d 601 (2d Cir.1989).

■ 7. Under New York law, a court should avoid construing a contractual provision in a manner that renders contractual language meaningless or superfluous. *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 482 N.Y.S.2d 465, 472 N.E.2d 315, 318 (1984) ("In construing a contract one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless."); RESTATEMENT (SECOND) CONTRACTS § 203(a) (1986) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"); *Loctite VSI Inc. v. Chemfab New York Inc.*, 268 A.D.2d 869, 701 N.Y.S.2d 723, 725 (2000) ("courts should adopt an interpretation of a contract which gives meaning to every

provision of the contract, with no provision left without force and effect.").

8. When a party "is under no legal duty to indemnify, [the] contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed." *Hooper Assocs., Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903, 905 (1989); *see also Haynes v. Kleinewefers and Lembo Corp.,* 921 F.2d 453, 456 (2d Cir.1990) (noting that "unmistakable intention" to indemnify must exist before imposing duty to indemnify upon a party); *Goldwasser v. Geller,* 279 A.D.2d 297, 718 N.Y.S.2d 349, 350 (2001) ("An agreement to indemnify must be strictly construed and should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances.") (internal quotation and citation omitted).

9. An indemnification provision should be read "in conjunction with all other provisions in the agreement to avoid inconsistencies or an interpretation which would render another provision superfluous or without effect." *Promuto v. Waste Mgmt., Inc.,* 44 F.Supp.2d 628, 650 (S.D.N.Y.1999)(*quoting Hooper* 549 N.Y.S.2d 365, 548 N.E.2d at 905); *see Galli v. Metz,* 973 F.2d 145, 149 (2d Cir.1992) ("interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible' ") (*quoting Garza v. Marine Transp. Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988).)

10. An indemnity provision "should not be extended to include damages which are neither expressly within its terms nor of such character that it is reasonable to infer that they were intended to be covered under the contract." *Tokyo* *Tanker Co. v. Etra Shipping Corp.,* 142 A.D.2d 377, 536 N.Y.S.2d 75, 77–78 (1989) (internal quotation omitted).

*The Claims, Defenses and Counterclaims*

11. In its first claim for relief Kodak seeks damages and declaratory relief based on Sterling's failure to pay Sanofi the amounts due for retiree benefits calculated in accordance with the formulas in the Asset Purchase Agreement. In its second claim for relief Kodak seeks declaratory relief declaring that Sterling and Bayer are not entitled to indemnification under the provisions of the Stock Purchase Agreement for any liabilities of Sterling under Section 5.5 of the Asset Purchase Agreement. Bayer and Sterling contend that Kodak is not entitled to such relief because Sections 7.3(a)(ii) and 7.3(a)(v) of the Stock Purchase Agreement require Kodak to indemnify Sterling and Bayer for the disputed retiree benefits. Bayer and Sterling raise this claim both as a defense to Kodak's claims and as a first counterclaim for declaratory relief. While the initial pleadings were limited to arguments related to Section 7.3(a)(ii) of the Stock Purchase Agreement, the parties subsequently agreed to include claims and defenses related to Section 7.3(a)(v) of the Stock Purchase Agreement. (See Amended Joint Pre–Trial Order at 5–6.).

12. The clear and unambiguous language of Section 5.5(g) of the Asset Purchase Agreement imposes a mandatory obligation on Sterling to include active U.S. employees of Sterling on the closing date of the Asset Purchase Agreement in the denominator of the headcount fraction of the expense allocation formula, when calculating the percentage share of retiree benefit expenses reimbursable to Sterling by Sanofi. (PX–1 at EKC 005393—005394 (Section 5.5(g)).)

13. The clear and unambiguous language of Section 5.5(k) of the Asset Purchase Agreement imposes a mandatory obligation on Sterling to reimburse Sanofi for its share of retiree benefit expenses as calculated by including active U.S. employees of Sterling on the closing date of the Asset Purchase Agreement in the denominator of the headcount fraction of the expense allocation formula. (PX–1 at EKC 005395—005397 (Section 5.5(k)).)

14. The employees of Sterling's L & F business were active U.S. employees of Sterling on the closing date of the Asset Purchase Agreement (Stip. Fact ¶ 20) and therefore must be included in the denominator of the expense allocation formulas for purposes of allocating between Sterling and Sanofi the retiree benefit expenses of Sterling's former employees.

15. Sterling does not contest that it is obligated to exclude temporary employees from the numerator and denominator of the headcount fraction of the expense allocation formulas when calculating Sanofi's percentage share of retiree benefit expenses reimbursable to Sterling pursuant to Section 5.5(g) of the Asset Purchase Agreement, and when reimbursing Sanofi for Sterling's percentage share of retiree benefit expenses pursuant to Section 5.5(k) of the Asset Purchase Agreement. (Am. Joint Pretrial Order, Defs.' Statement of Defenses at 4–5.)

16. Sterling does not contest that it is obligated to include the employees of Sterling's L & F business in the denominator of the headcount fraction of the expense allocation formulas when calculating Sanofi's percentage share of retiree benefit expenses reimbursable to Sterling pursuant to Section 5.5(g) of the Asset Purchase Agreement, and when reimbursing Sanofi for Sterling's percentage share of retiree benefit expenses pursuant to Section 5.5(k) of the Asset Purchase Agreement. (Stip.

Fact ¶¶ 20, 21, 22, 23.) Even if Sterling and Bayer did not agree to this proposition, the unambiguous language of Sections 5.5(g) and 5.5(k) makes clear that active U.S. employees of L & F should be included in the headcount formulas in Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement, because the L & F business had not been sold prior to the closing of the Asset Purchase Agreement.

17. The Asset Purchase Agreement is a valid and enforceable contract. (Stip. Fact ¶ 8.)

18. Sanofi has performed its obligations under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement. To the extent Sanofi has not reimbursed Sterling for Sterling's reimbursable percentage share of expenses under Section 5.5(g) of the Asset Purchase Agreement, Sanofi was entitled to avoid this reimbursement in order to recoup the amounts owed to it by Sterling and not paid by Sterling. *Peuser v. Marsh,* 167 A.D. 604, 153 N.Y.S. 381, 384–385 (1915), *aff'd* 218 N.Y. 505, 113 N.E. 494 (1916).

19. Sterling has breached its obligations under Section 5.5(g) by calculating Sanofi's percentage share of retiree benefit expenses in a manner inconsistent with the formula required by Section 5.5(g).

20. Sterling has breached its obligations under Section 5.5(k) of the Asset Purchase Agreement by failing to pay to Sanofi its share of retiree benefit expenses in accordance with the formula required by Section 5.5(k).

21. Sanofi has demanded that Sterling pay its share of retiree benefit expenses, and Sterling has failed to pay to Sanofi the full amount demanded. (Findings of Fact ¶¶ 57–58.)

22. The clear and unambiguous language of Section 5.9(c) of the Stock

Purchase Agreement, Sections 5.9 and 5.19 of the Bayer Agreement and the Letter Agreement, impose a mandatory obligation on Bayer to cause Sterling to comply with its obligations under the Asset Purchase Agreement, including Sterling's obligations under Sections 5.5(g) and 5.5(k) of that Agreement. (PX–4 at EKC 005917 (Section 5.9(c)); PX–5 at EKC 006214—006215 (Section 5.9); PX–5 at EKC 006225 (Section 5.19); PX–6.)

23. The Stock Purchase Agreement, the Bayer Agreement and the Letter Agreement are each valid and enforceable contracts. (Stip. Fact ¶¶ 9, 10, 11.) Bayer has breached the Stock Purchase Agreement, the Bayer Agreement and the Letter Agreement by failing to cause Sterling to perform its obligations under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement.

24. Kodak has suffered actual injury as a result of Sterling's breach of its obligations and Bayer's breach of its obligations. (PX–33; PX–34; Tr. at 282 (Doolittle).) Therefore, Kodak is entitled to compensatory damages in the amount of $19,789,396, plus pre-judgment interest and costs. (*Id.*)

25. Pursuant to Section 7.3(a)(ii) of the Stock Purchase Agreement, Kodak's obligation to indemnify Sterling and Bayer for liabilities arising out of the "Transferred Businesses" does not include liabilities that were not transferred to Sanofi, and instead were expressly retained by Sterling, under the Asset Purchase Agreement. (PX–4 at EKC 005934—005935 (Section 7.3(a)(ii)).)

26. Sterling's liabilities for retiree benefit expenses under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement were expressly retained by Sterling pursuant to Sections 2.3(e) and 2.4(h) of the Asset Purchase Agreement. (PX–1 at EKC 005310 (Section 2.3(e)); PX–1 at EKC 005312 (Section 2.4(h)).) Thus, Sterling and Bayer are not entitled to indemnity from Kodak pursuant to Section 7.3(a)(ii) of the Stock Purchase Agreement for Sterling's share of retiree benefit expenses under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement.

27. The construction of Section 7.3(a)(ii) urged by defendants is unsupportable because it would render meaningless the repeated references in the Stock Purchase Agreement indicating that the sale of stock of Sterling was subject to the Asset Purchase Agreement, the extensive provisions allocating assets and liabilities in the Asset and Stock Purchase Agreements, including Kodak's express agreement to pay a specified percentage share of the retiree benefit expenses, and the other indemnities stated in the Stock Purchase Agreement. (PX–4 at EKC 005825 (Recitals); PX–4 at EKC 005881—005884 (Section 5.3); PX–4 at EKC 005914—005924 (Section 5.9); PX–4 at EKC 005925 (Section 5.11); PX–4 at EKC 005933—005937 (Section 7.3(a)); PX–1 at EKC 005303—005312 (Sections 2.1, 2.2, 2.3 and 2.4); PX–41 at B 001113—001114 (Section 2.4).) Among these provisions was the express agreement by SmithKline, assumed by Bayer, to cause Sterling to perform its obligations under the Asset Purchase Agreement (PX–4 at EKC 005917 (Section 5.9(c)).) One of those obligations was Sterling's· obligations under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement.

28. The inability of Sanofi, Kodak and defendants to determine the percentage of retiree benefit expenses attributable to the former employees of the portion of the pharmaceuticals business sold to Sanofi supports the use of the expense allocation formulas in Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement and ne-

gates the essential premise of defendants' argument that Kodak and SmithKline intended to override those formulas by agreeing to the indemnification provision in Section 7.3(a)(ii) of the Stock Purchase Agreement. (Tr. at 121–22 (Pollack); Tr. at 224–25 (Alpern); Tr. at 258–59 (Doolittle); Tr. at 340–41 (Gomez–Nieto); PX 36.)

29. The indemnity provision in Section 7.3(a)(ii) of the Stock Purchase Agreement must be strictly construed. *Hooper*, 549 N.Y.S.2d 365, 548 N.E.2d at 905; *Haynes*, 921 F.2d at 456; *Goldwasser* 718 N.Y.S.2d at 350. The contractual language must evince an "unmistakable intention" to indemnify Bayer for Sterling's retained retiree benefit liabilities in order for this Court to impose that indemnity obligation on Kodak. *Haynes*, 921 F.2d at 456; *Hooper*, 549 N.Y.S.2d 365, 548 N.E.2d at 905. Bayer and Sterling have failed to prove any such unmistakable intent in the language of Section 7.3(a)(ii). Indeed the reasonable interpretation of Section 7.3(a)(ii), supported by the testimony at trial, shows that the indemnity does not cover Sterling's obligations for retiree benefits under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement. Bayer and Sterling, therefore, are not entitled to be indemnified by Kodak under Section 7.3(a)(ii) of the Stock Purchase Agreement for any liabilities of Sterling arising from Sterling's obligations under Section 5.5(g) and 5.5(k) of the Asset Purchase Agreement.

30. Moreover, Bayer and Sterling are not entitled to indemnity from Kodak for the amounts Sterling has failed to pay Sanofi because Section 7.3(a)(ii) expressly provides that it "does not apply to any liability to the extent such liability arises out of . . . the breach by Purchaser of any covenant contained in Article V with respect to the Transferred Businesses or the breach by Sterling of any of the agreements of Sterling referred to in Section 5.9(c)." (PX–4 at EKC 005934 (Section 7.3(a)(ii)).) Sterling's failure to comply with the terms of the Asset Purchase Agreement is a breach of an agreement explicitly referenced in Section 5.9(c). Similarly, Bayer's failure, extending over a period of seven years, to cause Sterling to comply with the terms of the Asset Purchase Agreement is a direct breach of a covenant contained in Article V of the Stock Purchase Agreement.

31. Additionally, Bayer and Sterling are not entitled to be indemnified by Kodak under Section 7.3(a)(v) of the Stock Purchase Agreement for any liability of Sterling arising from Sterling's obligations under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement.

32. By its express language, Section 7.3(a)(v) does not require Kodak to indemnify Bayer or Sterling for liabilities relating to Sterling's Consumer Health Group or headquarters operations. (PX–4 at EKC 005935 (Section 7.3(a)(v)); PX–4 at EKC 005830 (Section 1.1).) Sterling's retained retiree benefit liabilities relate to each of those categories. (*See* Findings of Fact ¶¶ 77–78.) Kodak argues that the retiree benefit liability also arises out of the third category of liabilities excepted from the indemnification obligation, namely the assets and liabilities transferred to Sterling pursuant to the Restructuring. It is unnecessary to reach the validity of that argument because the retiree benefit liabilities fall within the other two categories of excepted liabilities.

33. The construction of Section 7.3(a)(v) urged by the defendants is unsupportable because it would render meaningless the repeated references in the Stock Purchase Agreement to Sterling being sold as an entity subject to the Asset Purchase Agreement, the extensive provisions allocating assets and liabilities in the Asset and Stock Purchase Agreement, including

Kodak's express agreement to pay a specified percentage share of the retiree benefit expenses, and other indemnities stated in the Stock Purchase Agreement. (*See* Conclusions of Law ¶ 27.) It would also be inconsistent with SmithKline's agreement, assumed by Bayer, to cause Sterling to perform its obligations under the Asset Purchase Agreement. (*Id.*)

34. To the extent any ambiguity exists in Section 7.3(a)(v) of the Stock Purchase Agreement, Section 7.3(a)(v) must be strictly construed, and in order for this Court to impose that indemnity obligation on Kodak, the provision must evince an "unmistakable intention" to indemnify Bayer for Sterling's retained retiree benefit liabilities. Bayer and Sterling have failed to prove any such unmistakable intent in the language of Section 7.3(a)(v). Indeed, Bayer and Sterling failed to request indemnity under Section 7.3(a)(v) of the Stock Purchase Agreement in any correspondence or dealings with Sanofi or Kodak until after they filed their counterclaims in this litigation. (Tr. at 287 (Doolittle); Defs.' Am. Ans. and Countercls.) The Court concludes that Sterling's retiree benefit expenses are not indemnifiable expenses under Section 7.3(a)(v).

35. Therefore, Kodak is entitled to recover damages in the amount of $19, 789, 396 plus pre-judgment interest and costs caused by the breaches of contract by Bayer and Sterling.

36. This is also an appropriate case for a declaratory judgment because it involves the construction of provisions in a contract, specifically Section 5.5(g) and 5.5(k) of the Asset Purchase Agreement, and Sections 7.3(a)(ii) and 7.3(a)(v) of the Stock Purchase Agreement. *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir.1992) (courts entertain declaratory judgment actions "when the judgment will serve a useful purpose in clarifying

and settling the legal relations in issue"); *accord Home Ins. Co. v. Spectrum Info. Techs., Inc.*, 930 F.Supp. 825, 844 (E.D.N.Y.1996). Kodak is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the L & F employees must be included in the denominator and temporary employees must be excluded from the numerator and denominator of the expense allocation formulas stated in Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement when calculating Sterling's and Sanofi's respective shares of retiree benefit expenses under those contractual provisions, and that Bayer and Sterling are required to reimburse Sanofi for Sanofi's net share of expenses as calculated pursuant to these formulas. Kodak is also entitled to a declaratory judgment that Bayer and Sterling are not entitled to be indemnified by Kodak under Sections 7.3(a)(ii) and 7.3(a)(v) of the Stock Purchase Agreement for any liability of Sterling arising from Sterling's obligations under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement. The defendant's request for a declaration to the contrary is denied.

37. Many of the specific claims, counterclaims and defenses in the case were resolved constructively by the parties and were not at issue at the trial. (*See* Amended Joint Pre–Trial Order at 2–8.) The Conclusions of Law above have decided the primary claims and counterclaims for relief. Three counterclaims remain to be decided, although their disposition is dictated by the above Findings of Fact and Conclusions of Law.

38. In the Eighth Counterclaim, the defendants seek reimbursement for a March 8, 2001 invoice from Bayer to Kodak. (DX–10.) There is no dispute that the invoice was not paid. Bayer seeks to recover $315,200 pursuant to that invoice which it contends was due for the Kodak

share of certain expenses for former Sterling employees. (*See* Sterling and Bayer's Am. Answer and Countercls. at Eighth Countercl.) Kodak contends that the amount was not calculated as required under Section 5.5(g) of the October 30, 1994 Amendment to the Stock Purchase Agreement. (PX–41 at B001113—001114 (Section 2.4); *See* Kodak Proposed Conclusions of Law at ¶ 47.) The defendants have not explained how the amount in the March 8, 2001 invoice was calculated and whether it was consistent with Section 5.5(g) of the Stock Purchase Agreement.

 39. Kodak is correct that it was entitled to setoff the amounts due to it from Sterling and Bayer for any amount it owed to Sterling or Bayer.

40. Kodak has established in its First Claim for Relief its right to receive compensatory damages from Sterling for its breach of the Asset Purchase Agreement, and Bayer for its breach of the Stock Purchase Agreement.

41. Kodak is entitled to setoff any amount owed by Kodak to Bayer under Defendants' Eighth Counterclaim from the amounts owed by Sterling and Bayer to Kodak under Kodak's First Claim for Relief. *Atlantic Mut. Ins. Co. v. Greater New York Mut. Ins. Co.,* 271 A.D.2d 278, 707 N.Y.S.2d 398, 400 (2000).

42. However, the fact that Kodak was entitled to setoff the far greater amounts owed to Kodak against the amount owed on the March 8, 2001 invoice to Sterling and Bayer does no resolve what, if any, amount was owed on the March 8, 2001 invoice. The parties may submit any further arguments, and if necessary, evidence on that issue, in connection with the formation of a judgment in this case.

43. Sterling and Bayer allege in the Ninth Counterclaim that they have been damaged by Kodak's failure to comply with its indemnity obligation under Section 7.3(a)(ii) and Section 7.3(a)(v) of the Stock Purchase Agreement to indemnify them for amounts Sterling claims are due and owing from Sanofi under Section 5.5(g) of the Asset Purchase Agreement.

 44. By failing to cause Sterling to comply with its obligations under Sections 5.5(g) and 5.5(k) of the Asset Purchase Agreement, Bayer has failed to perform its obligations under the Stock Purchase Agreement. Having failed to establish its own performance of its obligations under the Stock Purchase Agreement, Bayer cannot obtain relief from Kodak.

45. Kodak has established in its First Claim for Relief that Sterling has incorrectly calculated Sanofi's share of retiree benefit expenses under Section 5.5(g) of the Asset Purchase Agreement, and that Sanofi is entitled to retain the actual amount due under Section 5.5(g) to recoup its losses under Section 5.5(k). Defendants therefore have not sustained any injury in fact.

46. Similarly, Sterling and Bayer are not entitled to the declaratory judgment they seek in the Tenth Counterclaim declaring that Kodak has breached the Stock Purchase Agreement by failing to indemnify Sterling and Bayer for any amounts Sanofi refuses to pay under Section 5.5(g) of the Asset Purchase Agreement. As explained above, the defendants' interpretation of Section 5.5(g) with respect to Sanofi's payment obligation is incorrect. Moreover, the defendants' interpretation of Kodak's indemnification obligations under Section 7.3(a)(ii) and 7.3(a)(v) of the Stock Purchase Agreement is also incorrect. Therefore, the defendants are not entitled to the declaratory judgment they seek.

## CONCLUSION

The parties are directed to submit proposed final judgments by **October 28, 2002.** Any objections to the proposed judgments may be submitted by **November 1, 2002.**

**SO ORDERED.**