COMMONWEALTH ASSOCIATES,
Plaintiff,

v.

PALOMAR MEDICAL TECHNOLOGIES,
INC., Defendant.

No. 96 CIV. 1868 (HB)(MHD).

United States District Court,
S.D. New York.

June 2, 1997.

As Amended June 3, 1997.

Stewart D. Aaron, James V. Parravani, Dorsey & Whitney P.L.L.P., New York City, for plaintiff.

Robert S. Smith, Paul, Weiss, Rifkind, Wharton & Garrison, Stuart L. Shapiro, Michael I. Allen, Shapiro & Allen, New York City, for defendant.

## MEMORANDUM & ORDER

DOLINGER, United States Magistrate Judge.

Plaintiff Commonwealth Associates is an investment banking firm, and offers financial advisory services to other entities. It commenced this action against Palomar Medical Technologies, Inc. to seek redress for Palomar's alleged breach of a contract under which Palomar was to provide certain compensation to Commonwealth for the rendering of such advisory services.

By Memorandum and Order dated January 22, 1997, the Hon. Harold Baer granted a motion by plaintiff for partial summary judgment.[1] In his decision Judge Baer held that defendant had breached the agreement and was therefore liable to Commonwealth for its damages. The parties thereafter consented to try the damage question before me pursuant to 28 U.S.C. § 636(c).

We conducted a bench trial on April 14, 1997. Based on the evidence adduced at that trial, I conclude that Palomar is liable to plaintiff in the amount of $2,917,500.00 in contract damages. I further hold that Commonwealth is entitled to pre-judgment interest in the amount of $256,570.56.

### A. *The Facts*

Commonwealth and Palomar entered into a written agreement dated January 17, 1995. Under its terms, Commonwealth pledged to provide advisory services to Palomar for a period of nine months in connection with anticipated merger or acquisition transactions. (SJ Dec. at second page; Tr. 13–14, 16; PX 1 at ¶ 1).

In return Palomar agreed to pay Commonwealth $50,000.00 upon execution of the contract and further bound itself to issue five-year non-callable warrants to Commonwealth for the purchase of 25,000 shares of common stock of Palomar at $3.00 per share. To effectuate this transaction, the contract provided that the warrants were to be issued within forty-five days after execution and that the "terms and conditions" of the warrants were to "include antidilution provisions, registration rights and other provisions customarily included in warrant agreements, all to be mutually agreed upon; . . . ." Finally, the contract provided for the issuance of additional warrants for 25,000 shares "upon the consummation of any Acquisition." (Tr. 14, 78–82; PX 1 at ¶¶ 3(b)-(c)).

This contract was amended in part by a letter agreement dated March 9, 1995, which was executed by the chief executive officers of the two companies. (Tr. 14–15, 21–22; PX 2). Under its terms, the compensation to be provided to Commonwealth was increased in two respects. First, Palomar agreed to pay Commonwealth $12,500 upon execution of the amended agreement and to make monthly payments thereafter of $12,500.00, starting April 3, 1995 and continuing during the life of the contract. (Tr. 88–89; PX 2 at ¶ 1). Second, the parties agreed that the warrants to be issued to Commonwealth, irrespective of whether any transactions were completed, would be increased to cover 250,000 rather than 25,000 shares. (PX 2 at ¶ 2). In return, Commonwealth's chief executive officer, Michael Falk, apparently agreed informally that Commonwealth would devote still greater attention to the investment prospects of Palomar, although this promise was apparently not reduced to writing. (Tr. 25).

It is not disputed that Palomar never made any of the $12,500.00 payments required by the contract. (SJ Dec. at third page; Tr. 62–63). It is also not disputed that Palomar never issued the warrants to Commonwealth, as also required by the agreement (SJ Dec. at third page; Tr. at 23–23) and declined as well to register the warrants with the Securities and Exchange Commission ("SEC"). (Tr. 32).

Commonwealth Vice President Andres Bello was principally responsible for han-

---

1. Judge Baer's decision will be cited by the designation "(S/J Dec. at ——)", with the appropriate page numbers inserted.

dling the Palomar account. At the end of August or the beginning of September 1995, he contacted Palomar's chief executive officer, Steven Georgiev, and reminded him that Palomar had not executed a draft warrant agreement that had been transmitted to Palomar in February 1995 by counsel for Commonwealth. (Tr. 87–91; PX 3). Georgiev indicated that he could not locate the draft, and Bello agreed to transmit another draft, but with revisions to conform it to the March 9, 1995 letter agreement. (Tr. 90). That revised agreement and a form of warrant were sent to Georgiev on September 6, 1995. (Tr. 90; PX 4).

Palomar never executed the warrant agreement or issued the warrants. (Tr. 97, 98–103). Indeed, it never took any action either to comply with this aspect of the parties' contract or to cancel the agreement, as it was permitted to do under the contract. It did, however, comply with other aspects of its contractual obligations, including payment of the out-of-pocket disbursements incurred by Commonwealth in rendering required· services to Palomar. (Tr. 90–95; PXs 7–9).

By its terms, the agreement was to lapse in October 1995 unless renewed by Palomar. (Tr. 25; PX 1 at ¶ 1). The company did not take such a step, and thus the agreement lapsed on October 17, 1995. (Tr. 154).

Subsequent to this date, Commonwealth took little or no action for approximately five months in seeking to obtain an executed warrant agreement or the issuance of the warrants. According to Mr. Falk, Commonwealth did not press the matter because it did not have any immediate intention to sell the shares represented by the warrants, and he believed that it was disadvantageous to seek registration of the warrants and the issuance of the shares because the registration could become "stale", that is, lose its legal effect. (Tr. 10, 56–57. *See also* Tr. 97–98).

Finally, on March 5, 1996 Commonwealth transmitted a letter to Palomar, formally requesting the registration of the warrants with the SEC and the issuance of the 250,000 shares. (Tr. 27–29; PX 5). According to Mr. Falk, it undertook that step because it was prepared to arrange a fairly prompt sale of the shares. That decision resulted from the confluence of two factors. First, the market price of Palomar shares had risen to more than $12.00 per share, thus guaranteeing Commonwealth a substantial profit if it sold promptly. (Tr. 26; PX 12). Second, Commonwealth was facing a cash flow problem because it was required to repay two substantial obligations, one by June 30, 1996 and the other in September 1996. (Tr. 26–27).

Palomar did not respond to this letter in any way. (Tr. 31). Accordingly, Bello sought to elicit a response by repeated telephone calls to the principal representatives of the company. He finally reached Georgiev, who indicated that the company was not prepared to honor the commitment to issue the warrants and assign the shares to Commonwealth at the specified price. (Tr. 99–102).

Consistent with its refusal to honor this aspect of the agreement, Palomar failed to notify Commonwealth of registrations that it was filing with the SEC. (Tr. 32). Among these was a registration filed on April 9, 1996. (Tr. 45–46; PX 13).

*ANALYSIS*

The decision by Judge Baer establishes that defendant breached the agreement in two respect. First, Palomar failed to make the required monthly payments. Second, it failed to meet its obligations with respect to the issuance and registration of the warrants. These holdings are law of the case, and we are accordingly limited to assessing the extent of plaintiff's damages.

■ The contract provided that it was to be governed by New York law (PX 1 at ¶ 11), a selection that is not disputed now by either party. Under New York law, the prevailing plaintiff in a breach-of-contract action is entitled to damages sufficient to place it in the position that it would have occupied if the breaching party had performed. *See, e.g., Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 609, 136 L.Ed.2d 535 (1996). The application of that general test is fairly straightforward in this case.

■ With regard to the monthly installments required under the revised version of the contract, there is no question that Palomar was obligated to pay Commonwealth $12,500 upon execution of the March 1995 amendment and then the same amount per month from April through October 1995.[2] This totals $100,000.00, and since Palomar failed to make these payments, it is now obligated to compensate plaintiff in that amount.

The assessment of damages flowing from defendant's failure to honor the warrant provision requires a somewhat more extended analysis. That provision entitled Commonwealth to receive warrants for 250,000 shares of common stock of Palomar. The warrants in turn would entitle plaintiff to compel Palomar to issue the shares and sell them to Commonwealth at a price of $3.00 per share.

■ As noted, defendant failed to comply in any respect with the agreement concerning the issuance of warrants. The key aspect of that failure, however, was not the non-issuance of the warrants themselves since the warrants, until registered, would convey no title to Commonwealth. Rather, it was the refusal of Palomar to honor the demand of Commonwealth, embodied in its March 5, 1996 letter, that it register the warrants, issue the shares and assign them to Commonwealth. These are the necessary steps to permit Commonwealth to dispose of the shares, and Palomar's refusal to perform thereby deprived Commonwealth of the ability to sell the shares at a price likely to be in excess of the so-called strike price of $3.00. It remains for us to determine what Commonwealth lost by virtue of that breach.

The evidence on this matter is largely uncontradicted. According to Mr. Falk, it was the intention of Commonwealth, when it sent the March 5, 1996 letter to Palomar, that it would sell the shares promptly after receiving them from Palomar in order to generate cash to pay the two large obligations that were coming due in June and September. According to Mr. Falk, this goal was realizable because the market price of Palomar had substantially appreciated in the preceding months, to a level in excess of $12.00 per share.

A review of the price chart in the record confirms this point. By way of illustration, on March 9, 1995, when the amended contract was executed, the common stock of Palomar was selling at $3.00. As late as the end of December 1995, the stock was selling at less than $6.00. Yet, by March 1, 1996 the per-share price had soared to $13 1/8, and it remained at 12 1/4 on March 5, the day on which Commonwealth sent its demand letter to Palomar. (PX 12).

■ In determining damages, we look to what would most probably have occurred if Palomar had performed as required by the contract. In assessing damages, particularly for lost profits, we recognize the inevitability of some imprecision in the proof, and note that certainty as to the amount of damages is not required, particularly when it is the defendant's breach that has made such imprecision unavoidable. *See, e.g., Indu Craft*, 47 F.3d at 496; *Lamborn v. Dittmer*, 873 F.2d 522, 532–33 (2d Cir.1989); *Russell Pipe & Foundry Co., Inc. v. City of New York*, 1997 WL 80601, at *15 (S.D.N.Y. Feb.25, 1997).

In this case, it is undisputed that if Palomar had complied with the requests contained in the March 5, 1996 letter from Commonwealth, it would probably have taken between twenty and sixty days to arrange for the registration of the warrants and the issuance of the stock to Commonwealth. (Tr. 108–09). I also note that, in the wake of the March 5 letter, if Palomar had notified Commonwealth of its intention to file a registration statement on or about

2. In his opinion Judge Baer states that the new agreement required the initial payment and then monthly payments "during the term of the January 17 agreement." (S/J Dec. at second page). If intended to suggest that Palomar owed payments for January through March, in addition to the payment on execution, this is erroneous. The agreement contemplated an initial payment and then monthly payments from April 3 through the end of the contract. Since this error is plain, we view ourselves as not bound by the prior decision in this respect. *See, e.g., North River Ins. Co. v. Philadelphia Reins. Corp.*, 63 F.3d 160, 165 (2d Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1289, 134 L.Ed.2d 233 (1996); *Time Products, plc v. J. Tiras Classic Handbags, Inc.*, 1997 WL 139525, at *2 (S.D.N.Y. Mar.26, 1997).

April 8, 1996, Commonwealth would probably have agreed to have the registration of the warrants "piggybacked" on that application, thus lessening any expense to Palomar. (Tr. 45–46).

Mr. Falk also testified without contradiction that, once the 250,000 shares had been received, Commonwealth would have proceeded to sell them on the market over a relatively short period of time, at all events within thirty days after receipt. (Tr. 39–40). In support of that suggestion, Mr. Falk noted that by March 1996, the volume of transactions in Palomar stock was quite substantial, thus permitting quicker sale of the 250,000 shares without disrupting the market price. (*Id.*).

If events had followed that course, the registration would have been effective by June 14, 1996, since that was in fact the effective date of the April registration statement. (Tr. 47). In view of plaintiff's interest in raising cash quickly before June 30, 1996, we readily infer that it would have sold the shares between June 14 and June 28, 1996, the available trading period after the registration took effect. (*See* Tr. 39–40).

For simplicity we will assume that equal numbers of shares would have been sold daily on those trading days. Based on the prices for those days reported by NASDAQ, that scenario would have generated $3,567,-500.00 in revenue.[3] Less the $3.00 per share price payable to Palomar under the terms of the warrants, Commonwealth would have realized $2,817,500.00 in profit on this transaction.

 In opposing this conclusion Palomar presses the notion that it materially breached the contract as early as April 1995 by failing to deliver the warrants to plaintiff and by failing to make the required monthly payments commencing in or around that period. Defendant then cites *Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136, 140–41 (2d Cir.1983), for the proposition that plaintiff's recoverable loss is the market value of the warrants shortly after the time of

the breach—that is, the failure to deliver the warrants in the Spring of 1995. According to defendant, the warrants at the time had at least some theoretical value, which it calculates at $125,000.00, and defendant therefore argues that plaintiff's recoverable damages are limited to this sum and the $100,000.00 in monthly payments that were concededly not made, or a total of $225,000.00, plus interest.

Defendant misconstrues the import of *Schultz*. The Court there dealt with a claim for conversion of securities and addressed the measure of damages that applies to an asset with a fluctuating market price. As the Second Circuit noted, the benchmark standard was established by the Supreme Court in *Galigher v. Jones*, 129 U.S. 193, 9 S.Ct. 335, 32 L.Ed. 658 (1889), a case in which a stockbroker had failed to purchase shares of stock at his customer's instructions and had sold other shares without authorization. Addressing the question of damages, the High Court held:

> the measure of damages in stock transactions of this kind is the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter, to be allowed to the party injured to place himself in the position he would have been in had not his rights been violated.

*Id.* at 200, 9 S.Ct. at 337.

*Gallagher* departed from the traditional conversion rule, which is premised on the value of the chattel at the time of conversion. As the Court observed, that rule would be unfair in the case of investment properties of fluctuating value, since the conversion denied the owner the ability to wait for a favorable moment to sell the shares. *See Schultz*, 716 F.2d at 140 (quoting *Gallagher*, 129 U.S. at 200, 9 S.Ct. at 337).

In selecting an appropriate measure, however, *Gallagher* rejected the so-called English rule, which permitted the plaintiff the highest value of the stock between the time of conversion and the time of trial. *Id.* at

---

**3.** There is no evidence in the record to suggest that the sale of 25,000 shares on each of those days would have materially affected the market price, much less any evidence as to extent of any

such possible impact. I note that the NASDAQ summary indicates that daily sales volume during the pertinent period fluctuated between approximately 337,000 and 594,600 shares.

201, 9 S.Ct. at 337–38. Instead, it opted for a middle-of-the-road measure, which awarded plaintiff "the highest intermediate value of the stock between the time of its conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock." *Id.*

As the Court in *Schultz* noted, the reference to replacement of the stock was not intended to signify that the owner was actually required to reenter the market and replace the converted securities. Rather, it was intended "simply to establish the outer time limit of a reasonable period during which the highest intermediate value of the lost stock could be ascertained." *Id.* The point was that, "[j]ust as it would be unjust to limit damages to the value of lost stock at the time of conversion, it would be similarly unjust to award as damages the highest value attained by the stock at a point in time well after an injured party who wanted to continue speculating in the market knew his shares were lost and could have replaced them." *Id.* The Second Circuit also noted that, in applying this rule, we must bear in mind that "what constitutes a reasonable period between the act complained of and the time when reentry into the market would be both warranted and possible will vary from case to case...." *Id.*

■ The *Schultz* court also noted a gloss that this Circuit has applied to this test to avoid an inappropriate windfall to plaintiffs. The concern is that the claimant not receive the highest value if that high point occurred before he had notice of the conversion. Thus the applicable rule in this circuit dictates that recovery for conversion of stock "is either (1) its value at the time of conversion, or (2) its highest intermediate value between notice of the conversion and a reasonable time thereafter during which the stock could have been replaced had that been desired, whichever of (1) or (2) is higher." *Id.* at 141.

This standard does not support defendant's attempt to limit plaintiff's damages in this case. First, the breach in question was the failure to register the warrants and issue the shares, as requested in March 1996. Second, even if we viewed the breach as occurring earlier, the "reasonable period" for measuring plaintiff's loss is appropriately viewed, in this case, as encompassing the Spring of 1996. Third, there is no meaningful evidence that plaintiff could have "replaced" the warrants at any time during the relevant period and hence the underlying policy that otherwise might justify limiting the time frame for measuring damages to a shorter period than sought by plaintiff is lacking. I address each of these points in turn.

The contract in question contemplated a series of steps that would have to be taken in order to provide plaintiff the benefit of the bargain into which it had entered. Defendant would have to issue warrants for the requisite number of shares to the plaintiff. Plaintiff then would have the option, at a time of its choosing within the next five years, to require defendant to register the warrants and issue the shares in exchange for a share price of three dollars. Plaintiff would then have the ability to sell at whatever the market price might be and thereby presumably earn a profit.

Defendant focusses on the fact that the contract called for it to issue the warrants shortly after the agreement was executed, and it notes that this was in the Spring of 1995. It thus invites us to view the conversion as having occurred at that time. Alternatively, defendant suggests that it had plainly repudiated the contract by at least June 1995 and that the conversion should be viewed as having occurred, at the latest, at that point.

This approach is unrealistic. As the testimony at trial made plain, the key event for purposes of ensuring plaintiff the benefit of its bargain was not the issuance of the warrants, which by themselves had little value, but rather the subsequent registration of the warrants, which would permit the issuance of shares and their sale to plaintiff. The credible testimony was to the effect that plaintiff had no interest in obtaining the warrants themselves, and was interested only in being able to obtain their registration and the stock issuance at a time when it was to the plaintiff's advantage to have possession of the shares for purposes of resale. Moreover, given the terms of the agreement, even if

defendant initially delayed issuance of the warrants beyond the time specified by the agreement, it was still plainly obligated at a later date to issue and honor them. Thus, unlike the cases involving a purchase of stock, we do not interpret the initial failure to issue the warrants in March 1995 as equivalent to a conversion, particularly since both parties viewed that step as a mere technicality; rather, the relevant breach occurred when defendant failed to honor plaintiff's request for registration and issuance of the shares in March 1996.

I also note that defendant's effort to demonstrate that the contract was a dead letter before the end of the Spring of 1995 is simply not supported by the evidence. Although defendant never paid the monthly installments of $12,500 commencing in March 1995, this appears not to have been noted by plaintiff, apparently because it ·did not view the matter as being of any significance. Similarly, although a consultant to both parties by the name of Joe Levangie apparently communicated to an officer of plaintiff in June 1995 that defendant's managers were unhappy with the performance of their contact person at Commonwealth (Tr. 152–55 & DX I), this plainly did not amount to a repudiation of the contract by defendant. Levangie had no authority to repudiate the contract (Tr. 160) and did not purport to do so. (*See* DX I. *See also* PX 27). Moreover, whatever defendant's current characterization of its views about the contract, both parties continued to operate under the assumption that it remained in effect until its specified termination date in October 1995, when defendant chose not to renew it. Thus, as late as

September 1995, defendant was paying bills submitted to it by plaintiff for expenses incurred in carrying out plaintiff's responsibility as a financial consultant to defendant. (Tr. 90–95; PX 9). Under these circumstances, plaintiff was justified in assuming that defendant would honor its obligation with regard to the warrants on demand.[4]

Alternatively, even if we viewed the conversion as having technically taken place before March 1996, the result would not change. As noted, *Gallagher* and *Schultz* require only that the loss to the plaintiff be measured by the highest price during a reasonable period of time after the conversion, and the courts explicitly recognize that what constitutes a reasonable period will vary from case to case depending on the circumstances. Moreover, as noted, the Second Circuit views the relevant time period as commencing from the time that the plaintiff becomes aware of the conversion.

In this case the credible evidence indicates that plaintiff viewed the warrants as a mechanism for making a long-term investment in defendant (Tr. 17), and that it anticipated waiting to seek registration until it was prepared to resell, an event that it anticipated would await a particularized need for funds and, hopefully, an elevated market price. Both of these events coincided in or about March 1996, and we have no reason to view this timing as suspect or as reflecting a windfall for plaintiff. Rather, for the reasons already noted, this approach places plaintiff in the position in which we believe it would have found itself if defendant had performed as required under the contract. That is all that *Gallagher* and *Schultz* require. *See*

---

**4.** Defendant also appears to argue that the parties never entered into a binding contract with regard to the warrants because they never signed a writing specifying certain of the conditions concerning their registration. Putting to one side the fact that Judge Baer's decision as to liability is law of the case and precludes this argument for non-liability on this breach, we note that the parties had plainly agreed on all material terms relevant to this transaction. The executed January 1995 contract provided that the parties were in agreement that the standard industry terms would apply to the question of when plaintiff might demand registration and issuance of shares. The testimony at trial was clear and not meaningfully contradicted that the

standard terms embodied one registration on demand—that is, whenever plaintiff elected to invoke its right to registration—and a right to "piggyback" on the issuer's own registration. (Tr. 9, 84–85. *See also* Tr. 19). Our analysis of damages is consistent with this interpretation.

In sum, we view the parties as having agreed on all material terms, and although they plainly contemplated that these conditions would ultimately be reduced to writing, they equally agreed to be bound before such a document was drafted and signed. *See, e.g., International Minerals & Resources S.A. v. Lygren,* 96 F.3d 586, 593 (2d Cir.1996); *Kaplan v. Vincent,* 937 F.Supp. 307, 312 (S.D.N.Y.1996).

*Schultz,* 716 F.2d at 139–40 (quoting *Gallagher,* 129 U.S. at 200, 9 S.Ct. at 337).

Furthermore, as noted, we conclude that plaintiff did not in fact learn of the defendant's repudiation of the contract, and thus its "conversion" of the underlying shares, until March 1996, when defendant declined to honor the warrant provision of the contract. Under *Schultz,* the pertinent period thus runs from March 1996.

Finally, we note that the factual premise for the *Schultz* analysis appears inapplicable in this case. As noted, the time limitation in question is predicated on the notion that the investor, once he learns of the conversion, can reenter the market to "replace" the lost shares. This is certainly true with respect to most shares of stock and also with some futures contracts and other investment vehicles. Defendant failed in this case, however, to demonstrate the availability of a market in which plaintiff might readily have replaced the warrants for which it had contracted. The most that defendant could offer was the testimony of its current chief financial officer to the effect that corporate documents on file with the SEC reflected the ownership by a handful of investors of some forms of warrants for shares of defendant. (Tr. 120–23). This information is of little consequence for our analysis. Defendant offered no evidence that there was any market for such instruments or that the few warrant holders were remotely interested in selling their warrants. (Tr. 132–33).

It was of course possible for the plaintiff to have purchased common shares of defendant in 1995, if we assume that plaintiff was aware that the warrants would not be forthcoming. But this plainly is not an equivalent security since, unlike the investor in warrants, the purchaser of market shares must assume the full risk of a decline in the market price of the stock. The value of the warrants is precisely in their insulation of the investor from such a risk, since the warrant holder is not obliged to exercise the warrants and purchase shares. To require the claimant to

undertake such new risk would be inconsistent with the general policy underlying the rule that in no circumstances must an injured purchaser actually enter the market. As the Second Circuit explained in *Schultz:*

> The value of lost securities may rise dramatically the day after a wrongful conversion and then embark on a prolonged downward spiral. Had the owner of such securities not been wrongfully parted [from] them, he might well have been prompted to sell them within a few days, as their value began to plummet. To require him actually to reenter the market and repurchase the same securities as a predicate for a damage claim, when steadily falling prices render such an investment imprudent, would frustrate the rule which seeks to make an investor whole. Rather than mitigating damages, as this example illustrates, a requirement that there be an actual repurchase could result in an *increase* in damages.

*Schultz,* 716 F.2d at 140 (emphasis in original).

We recognize that this analysis is not directly applicable here since defendant is not arguing that plaintiff should have bought shares, but rather that the cutoff for price fluctuations should be imposed as of sometime in 1995. Our point, however, is that a predicate for the cutoff is the presumed ability of the investor to cover following his discovery of the conversion, and we believe that the purchase of common shares is not such an equivalent purchase since it plainly adds to the claimant's risk, an outcome that *Schultz* views as impermissible in measuring damages.

In sum, defendant's efforts to minimize plaintiff's damages are unavailing. We conclude that plaintiff's recoverable damages consist of $100,000.00 for non-payment of the contractually required cash payments, and $2,817,500.00 in profits lost by virtue of Palomar's failure to honor its obligations with respect to the warrants.[5] All that remains is

---

5. Plaintiff seeks a larger recovery by assuming that it would have sold at the height of the market, on May 6, 1996. (Tr. 39). We conclude that this mode of analysis is not justified by the evidence. Unlike the cited cases, which offer no distinct evidence as to what would have occurred if the defendant had performed, in this case plaintiff has offered specific and persuasive evi-

the calculation of pre-judgment interest, to which I now turn.

B. *Pre–Judgment Interest*

█ Plaintiff is entitled to pre-judgment interest for defendant's breach of contract. CPLR § 5001. The applicable rate is nine percent per year. CPLR § 5004.

Defendant's failure to pay the monthly $12,500 installments, each due on the first business day of the month, yields accrued interest totalling $17,625.00 as of May 31, 1997. As for the loss of the projected profit of $2,817,500.00, measured from the midpoint of the two-week period during which we assume that plaintiff would have sold the shares, we calculate prejudgment interest, as of May 31, 1997, amounting to $238,945.56.

## CONCLUSION

Based upon the foregoing analysis judgment is to be entered in favor of plaintiff Commonwealth Associates and against defendant Palomar Medical Technologies, Inc. in the amount of $2,917,500.00 in principal and $256,570.56 in pre-judgment interest, or a total of $3,174,070.56.

dence as to its intentions if the defendant had honored its request. Since plaintiff had a definite strategy with an inferable time table, we use that projected strategy and timetable, which will result in placing plaintiff "in the position [it] would have been in had not [its] rights been violated." *Gallagher*, 129 U.S. at 200, 9 S.Ct. at 337.