**OSCAR GRUSS & SON, INC.,
P laintiff-Counter-Defendant-
Appellee-Cross-Appellant,**

v.

**Yossie HOLLANDER, Defendant-
Counter-Claimant-Appellant-
Cross-Appellee,**

**Docket Nos. 02–7087, 02–7133.**

United States Court of Appeals,
Second Circuit.

Argued: March 25, 2003.

Decided: July 23, 2003.

---

Robert S. Churchill, Eaton & VanWinkle LLP, New York, New York, (Brendan R. Marx on the brief) for Plaintiff–Counter–Defendant–Appellee–Cross–Appellant.

Harris N. Cogan, Blank Rome Tenzer Greenblatt LLP, New York, New York, (Mojirade A. James on the brief) for Defendant–Counter–Claimant–Appellant–Cross–Appellee.

Before: McLAUGHLIN, KATZMANN and B.D. PARKER, Jr., Circuit Judges.

McLAUGHLIN, Circuit Judge.

Yossie Hollander appeals from a judgment of the United States District Court for the Southern District of New York (Berman, *J.*) awarding breach of contract damages to plaintiff Oscar Gruss & Son, Inc. ("OGSI") in the amount of $482,021.60, plus attorneys' fees and interest, arising from Hollander's failure to deliver warrants pursuant to an Engagement Letter. Hollander challenges the district court's computation of damages and argues that under New York law the district court should have valued the warrants from the date of the breach. Hollander further maintains that the district court improperly awarded attorneys' fees to OGSI based on an erroneous interpretation of the third-party indemnification clause in the Engagement Letter.

Because the district court should have calculated OGSI's damages from the date of the breach and because it improperly awarded attorneys' fees to OGSI, we affirm in part, vacate in part, and remand with instructions to determine the date of breach and to recompute OGSI's breach of contract damages accordingly.

## BACKGROUND

In 1983 Yossie Hollander founded Fourth Dimension Software Ltd., a private Israeli software corporation. He later renamed it New Dimension Software Ltd. ("4D"). In late 1992, 4D went public in an initial public offering (the "IPO"). After the IPO, Hollander owned about 34% of 4D's stock, while Roni Einav and Dalia Prashker–Katzman together controlled another 34%. The remaining 32% of the stock was publicly traded on the NASDAQ market.

Following the IPO, Hollander's relationship with Einav and Prashker–Katzman soured. In late 1994, Hollander resigned from 4D's Board of Directors and was terminated as Chief Executive Officer ("CEO"). He kept his 34% stock interest, however.

Hollander wanted to reacquire control of 4D. He began negotiating the terms of an engagement letter with Oscar Gruss & Son, Inc. ("OGSI"), a small New York investment banking firm. On February 3, 1995, OGSI and Hollander came to an agreement (the "Engagement Letter").

## A. The Engagement Letter

The Engagement Letter provided that Hollander was hiring OGSI on an exclusive basis to render financial advisory services in connection with Hollander's attempt to acquire more shares of 4D. The letter included OGSI's obligations: (1) to provide advisory services, general business and financial analysis, transaction feasibility analysis and pricing; (2) to assist in negotiations and related strategy; (3) to act as dealer/manager in any tender offer; (4) to assist in corporate capital planning; (5) to provide a fairness opinion; and (6) to use its best efforts to raise between $20 and $25 million to reacquire 4D stock.

OGSI had initially asked for a $100,000 retainer, but Hollander balked at so large an initial cash outlay. The Engagement Letter thus provided that Hollander would pay OGSI a retainer of only $50,000 in cash but would give OGSI warrants, which "shall vest immediately upon signing this Agreement," to acquire 25,000 shares of 4D common stock held by Hollander. OGSI could not exercise the warrants before January 1, 1998, but could exercise them at a price of $4.30 per share any time thereafter.

Hollander would retain the right to buy back the warrants any time during the four-year period commencing February 5, 1995 whenever the market price of 4D stock exceeded twice the exercise price for the warrants (i.e., reached $8.60 per share). The cost to Hollander to buy back the warrants would be the current market price for 4D common stock minus the $4.30

exercise price. On January 2, 1997, 4D's common stock closed above $8.60.

In 1995 and 1996 OGSI conveyed most of its interest (88.47%) in the warrants to six (6) present and former employees of OGSI. Significantly, OGSI retained an 11.53% interest in the warrants.

The Engagement Letter also provided that OGSI was entitled to reimbursement from Hollander for OGSI's reasonable expenses in connection with its services—up to a maximum of $10,000. In 1995, OGSI billed Hollander $5,454.04 for expenses, but was never paid.

The district court found that OGSI performed its obligation under the Engagement Letter. Specifically, OGSI had introduced Hollander to potential investors and sources of financing, had created and distributed an "investor memorandum" to potential investors, and had met with Einav and Prashker–Katzman.

## B. Hollander's Failure to Deliver Warrants

Hollander did pay OGSI the $50,000 retainer fee in cash, but he never delivered the warrants to OGSI. In February 1997, OGSI demanded delivery of the warrants. Hollander responded that "[w]hile you may believe that payment was not dependent upon the *successful completion of the transaction* for which I engaged the services of OGSI, it is undeniable that payment for such services was indeed dependent upon such services being rendered." (emphasis added). In March 1997, OGSI threatened litigation.

## C. BMC Tender Offer

OGSI was unsuccessful in its efforts to assist Hollander in reacquiring control of 4D. Then, in 1999, BMC Software, Ltd. ("BMC") made a tender offer for 4D's shares. BMC was successful and acquired

all the outstanding shares of 4D common stock (including Hollander's) at a price of $52.50 per share.

## D. *Procedural History*

Because of Hollander's refusal to deliver the warrants, OGSI sued for breach of contract in the United States District Court for the Southern District of New York (Berman, *J.*). Diversity jurisdiction was alleged. Hollander disputed diversity, alleging that a non-diverse necessary co-plaintiff had not been joined. Hollander also counterclaimed for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, negligent misrepresentation, and breach of fiduciary duty.

The district court determined that it had subject matter jurisdiction under 28 U.S.C. § 1332(a) because the parties were diverse. Hollander had argued that diversity jurisdiction was destroyed because one of the six (6) former employees to whom OGSI assigned an interest in the 4D warrants was, like Hollander himself, a citizen of Israel throughout the course of the litigation. Rejecting Hollander's contention, the district court found that all six (6) employees signed a Letter Agreement, dated July 23, 1998 ("Letter Agreement"), vesting OGSI with authority to commence litigation and to make all decisions relating to enforcement of the Engagement Letter. Diversity jurisdiction was therefore proper.

After discovery, plaintiff OGSI moved for summary judgment. Defendant Hollander opposed the motion and cross-moved for partial summary judgment. The district court granted OGSI's motion, finding that the Engagement Letter required Hollander to deliver the warrants to OGSI "shortly after the execution of the Engagement Letter." As a result of his failure to do so, the district court conclud-

ed that Hollander "unequivocally" breached the Engagement Letter.

The district court also dismissed Hollander's counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing. It reserved for trial the issue of damages and three of Hollander's counterclaims: fraudulent inducement, negligent misrepresentation, and breach of fiduciary duty.

A bench trial was then held to determine OGSI's damages and to rule on Hollander's surviving counterclaims. Based upon documentary evidence and witness testimony, the district court dismissed all of Hollander's counterclaims.

## E. *Value of the Warrants*

In valuing the warrants, the district court also made a determination as to how long OGSI would have held the warrants before exercising them. The court noted that since April 1996, Michael Shaoul, OGSI's Chief Operating Officer, was primarily responsible for implementing OGSI's warrants practices. Shaoul testified that he closely followed 4D stock from the day he was employed by OGSI until the BMC tender offer was consummated in April 1999. Shaoul also stated that OGSI would have held the 4D warrants for at least fourteen (14) months after the initial exercise date of January 1, 1998—just about the time of the BMC tender offer. The district court credited Shaoul's conclusion that the 4D warrants were "a particularly suitable security to hold for long term appreciation."

Based largely on the testimony of Michael Shaoul, the district court concluded that OGSI would have held the warrants for the longest term possible. The district court determined that April 9, 1999 was "[t]he appropriate date to fix the value of OGSI's 11.53% share of the warrants [be-

cause this date] is the most likely date on which OGSI would have exercised the warrants." On April 9, 1999, the date of the BMC tender offer, the warrants were valued at $52.50. Thus, the district court determined the value of OGSI's 11.53% interest to be $151,357.50.

As to the remaining 88.47% interest in the warrants, the district court determined that there was "little or no evidence" as to when any of the individual assignees would have sought to exercise their warrants. The court set the date for determining the value of the remaining 88.47% of the warrants at the "reasonable 'intermediate' date" of January 1, 1998—the first date on which the individuals would have been able to exercise the warrants. The market price on January 1, 1998 was $19.25, and the individual warrant value was $14.95. The value of 88.47% of 25,000 warrants was therefore $330,664.10.

The district court found that there was "little or no evidence" to support Hollander's assertion that he would have exercised the buy-back provision of the Engagement Letter before it expired on February 5, 1999.

### F. Interest and Expenses

The district court determined that OGSI was owed interest on the sum of $151,357.50 from April 9, 1999. As to the individual warrant holders, the district court found they were entitled to interest on the sum of $330,664.10 from January 1, 1998.

The district court also awarded OGSI expenses in the sum of $5,454.04 and attorneys' fees in the amount of $277,562.78. In support of its finding that OGSI had the right to attorneys' fees, the district court cited the indemnification provision contained in the Engagement Letter. Despite this, the district court directed the parties to appear before Magistrate Judge Douglas F. Eaton for "final computation and/or confirmation of expenses, legal fees and interest."

After further briefing by the parties, Magistrate Judge Eaton issued a Report and Recommendation ("Report") suggesting that the district court: (1) deny pre-judgment interest and compute interest on attorneys' fees and expenses from July 23, 2001 (the date the district court decision was filed); and (2) provide post-judgment interest. The district court adopted the Report, except as to the date for the accrual of interest on attorneys' fees. The district court found that Hollander's obligation to pay attorneys' fees arose from his failure to deliver the warrants to OGSI. The court stated that under New York CPLR § 5001(a), pre-judgment interest was due on attorneys' fees actually paid by OGSI. Accordingly, the court measured pre-judgment interest from the date OGSI first paid its attorneys (June 9, 1998).

### G. Judgment

Thereafter, the district court entered judgment against Hollander for $482,021.60, plus interest of $154,939.38. OGSI was also awarded $5,454.04 for reimbursable expenses under the Engagement Letter, plus interest of $2,200.00. The district court awarded OGSI $400,000.00 in attorneys' fees and expenses, plus interest of $44,366.93. The award to OGSI, including costs, totaled $1,089,001.95, with the accrual of interest commencing seven (7) days from the date of judgment. Hollander stipulated to the accuracy of all figures, reserving his right to appeal only (a) the valuation date of the warrants, and (b) OGSI's right to attorneys' fees and pre-judgment interest.

Hollander filed a timely appeal. OGSI filed a cross-appeal contending that the warrants held by individual employees of

OGSI should have been valued as of the tender offer, rather than on January 2, 1998.

## DISCUSSION

■ On appeal from a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo.* *See Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers, Ltd.,* 190 F.3d 64, 67 (2d Cir.1999). Mixed questions of law and fact are likewise reviewed *de novo. See Connors v. Conn. Gen. Life Ins. Co.,* 272 F.3d 127, 135 (2d Cir.2001); *White v. White Rose Food,* 237 F.3d 174, 178 (2d Cir.2001).

■ Under the clear error standard, we "may not reverse [a finding] even though convinced that had [we] been sitting as the trier of fact [we] would have weighed the evidence differently." *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Rather, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *see also Zervos v. Verizon New York, Inc.,* 252 F.3d 163, 168 (2d Cir.2001).

## I. *Subject Matter Jurisdiction—Diversity*

Hollander, an Israeli citizen, renews his claim on appeal that the district court lacked subject matter jurisdiction. He asserts that all six (6) OGSI employees to whom 88.47% of the warrants were assigned were real parties in interest and had to be joined in this litigation. He notes, however, that because one of the employees, Eddy Shalev, is a citizen of Israel and held 33.3% of the warrants, his

joinder would destroy diversity of citizenship. We disagree.

■ Failure of subject matter jurisdiction, of course, is not waivable and may be raised at any time by a party or by the court *sua sponte. Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 700 (2d Cir.2000). "If subject matter jurisdiction is lacking, the action must be dismissed." *See id.* at 700–01 (citing *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986)). We review the district court's factual findings regarding subject matter jurisdiction for clear error and its legal conclusion as to whether subject matter jurisdiction exists *de novo. See id.* at 701; *Key Mechanical Inc. v. BDC 56 LLC,* 330 F.3d 111, 119 (2d Cir.2003); *Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 930 (2d Cir.1998).

■ Federal courts have diversity jurisdiction over controversies between "citizens of different States." 28 U.S.C. § 1332(a)(1); U.S. Const. art. III, § 2. It is firmly established that "citizens" for purposes of a federal court's diversity jurisdiction "must be real and substantial parties to the controversy." *Navarro Sav. Assn. v. Lee,* 446 U.S. 458, 460, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980); *see also Airlines Reporting Corp. v. S and N Travel, Inc.,* 58 F.3d 857, 861 (2d Cir.1995).

■ Rule 17(a) of the Federal Rules of Civil Procedure requires that "[e]very action shall be prosecuted in the name of the real party in interest." Fed.R.Civ.P. 17(a). This means that an "action must be brought by the person who, according to the governing substantive law, is entitled to enforce the right." 6A Charles Alan Wright, et al., *Federal Practice & Procedure* § 1543, at 334 (2d ed.1990). Rule 17 does not, however, affect jurisdiction and relates only to the determination of proper

parties and the capacity to sue. 4 James William Moore, et al., *Moore's Federal Practice* § 17.13[1] (3d ed.1999).

The Supreme Court has noted that although there exists a " 'rough symmetry' between the 'real party in interest' standard of Rule 17(a) and the rule that diversity jurisdiction depends upon the citizenship of real parties to the controversy ... the two rules serve different purposes and need not produce identical outcomes in all cases." *Navarro*, 446 U.S. at 462 n. 9, 100 S.Ct. 1779. Thus, although (under Rule 17(a)) OGSI is a "real party in interest" and, thus, the action may properly be maintained in its name, OGSI must also establish that it is a "real and substantial party to the controversy" for the purpose of determining diversity jurisdiction.

■ To establish whether a plaintiff is a "real and substantial party to the controversy," a crucial distinction must be made between a plaintiff who sues solely in his capacity as an agent, on the one hand, and, on the other, a plaintiff who sues not only as an agent, but also as an individual who has his own stake in the litigation. Hollander correctly notes that where a plaintiff brings a suit solely in his representative capacity, the citizenship of the represented party, and not that of the representative, controls. *Moore's Federal Practice, supra* § 17.13[2][b].

This distinction animates *Airlines Reporting Corp. (ARC) v. S & N Travel, Inc.*, 58 F.3d 857 (2d Cir.1995), where we refused to consider ARC's corporate citizenship controlling when ARC acted merely as an agent for the interests of others. We held that the citizenship of the represented individuals controlled for diversity purposes. *Id.* at 862. We found it significant that ARC "did not seek to protect any corporate interests of its own," did not suffer "any corporate damage or pecuniary loss itself," nor did it "lay claim to any

portion of the potential recovery." *Id.* In sum, we concluded that ARC was "a mere conduit for a remedy owing to others, advancing no specific interests of its own." *Id.*

■ Here, OGSI retained an 11.53% interest in the warrants. It suffered a pecuniary loss and is entitled to a portion of the damages award. As such, unlike ARC, OGSI is not "a mere conduit" but possesses a valid stake in the litigation sufficient to be considered a "real and substantial" party for diversity purposes.

Hollander's reliance on *E.R. Squibb & Sons, Inc. v. Accident and Casualty Insurance Co.*, 160 F.3d 925 (2d Cir.1998) ("*Squibb I* "), is misplaced. In *Squibb I*, a suit against a syndicate of underwriters, we remanded to the district court to determine whether the citizenship of every underwriter in the syndicate was relevant for diversity purposes. *Id.* at 938–39. In so doing, we observed that "we regularly exercise diversity jurisdiction in cases where non-diverse individuals or groups who are not direct parties to the litigation nevertheless have a crucial interest in its outcome." *Id.* at 936.

Following *Squibb I*, the parties stipulated that the original defendant (who was now dead) had been an underwriter and a British subject, and had appeared in the action both "in his individual capacity, and for administrative convenience, as a representative of all ... [u]nderwriters." *E.R. Squibb & Sons, Inc. v. Accident and Casualty Insurance Co.*, 241 F.3d 154, 161 (2d Cir.2001) ("*Squibb II* ") (quoting *Squibb I*, 160 F.3d at 928) (internal quotation marks omitted). A new defendant, another underwriter and British subject, was substituted to replace the original defendant. On remand, the district court found subject matter jurisdiction.

In a renewed appeal (*Squibb II* ), we held that because the defendant lead underwriter had been sued solely in his individual capacity, only his citizenship, and not that of the individual underwriters in the syndicate, needed to be considered for diversity purposes. *Id.* at 162. We found that each of the underwriters would be bound by the judgment against the individual defendant and that, given the unique structure of the syndicate, this was sufficient to protect the interests of all parties. *Id.*

 "[W]here multiple parties all have a financial interest in a lawsuit, a strategic choice of parties in order to maintain diversity is *not* considered to be collusive so long as the party chosen to bring the suit is in fact the *master of the litigation.*" *Transcontinental Oil Corp. v. Trenton Prods. Co.*, 560 F.2d 94, 103 (2d Cir.1977) (emphasis added). In *Transcontinental*, the plaintiff operated a syndicate investment in stock on behalf of himself and eleven (11) other investors. All members of the syndicate, except plaintiff, were citizens of New York. The plaintiff had an agreement with the eleven (11) members of the syndicate under which the plaintiff retained a minimal interest in the total syndicate investment.

One of the defendants entered into an agreement with the plaintiff under which the syndicate was to receive 650,000 shares of stock. Upon defendant's failure to deliver the stock, the plaintiff, a citizen of Connecticut, brought a breach of contract action against the defendant, a New York citizen. Plaintiff sued individually "and as nominee" of the syndicate. The defendant challenged the court's diversity jurisdiction. We affirmed the district court's conclusion that diversity existed because the plaintiff, rather than the eleven (11) non-diverse syndicate members, was "master of the litigation." *Id.* at 103 (citations

omitted). Specifically, the district court cited, among other things, that the plaintiff: (1) had negotiated and signed the agreement that was the subject of the action; (2) was most familiar with the matters in the suit; and (3) had a real and substantial financial interest in the outcome of the litigation. Accordingly, the district court found that the plaintiff was "no mere formal party." *Id.*

Here, the agreement entered into between OGSI and its former employees gave OGSI the express power to act on their behalf with regard to their rights in the warrants. The Letter Agreement vested OGSI with authority to "take such action as it may deem to be necessary or appropriate, in the exercise of its discretion, including commencing litigation, in order to attempt to enforce its rights under the Engagement Letter," and provided that "OGSI will make all decisions relating to the manner in which its rights under the Engagement Letter will be enforced and maintained and the attorneys who will act for it in connection therewith." Under the terms of the Letter Agreement, OGSI was clearly intended to be the "master of the litigation." Therefore, Shalev's citizenship is of no consequence to subject matter jurisdiction.

OGSI is incorporated and has its principal place of business in New York. In its decision, the district court made an explicit finding of fact that "at all relevant times . . . Hollander was a resident and domiciliary of Israel." Therefore, as between OGSI and Hollander, the district court properly found the necessary diversity of citizenship.

## II. *Valuation of Damages for the Warrants*

The principal grist for this appeal is the scope and measure of damages awarded to

OGSI for Hollander's breach of the Engagement Letter.

■■■ "Although the amount of recoverable damages is a question of fact, 'the measure of damages upon which the factual computation is based is a question of law.'" *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.,* 946 F.2d 1003, 1009 (2d Cir.1991) (quoting *United States ex rel. N. Maltese & Sons, Inc. v. Juno Constr. Corp.,* 759 F.2d 253, 255 (2d Cir. 1985)). In other words, whether the district court "correctly calculated damages is a question of law that we review *de novo.*" *Lauder v. First Unum Life Ins. Co.,* 284 F.3d 375, 379 (2d Cir.2002); *see also Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 261 (2d Cir.2002); *Juliano v. Health Maint. Org. of New Jersey, Inc.,* 221 F.3d 279, 286 (2d Cir.2000).

## A. *OGSI Warrants*

The district court calculated OGSI's damages from the date of the BMC tender offer, rather than the date of Hollander's breach. The district court reasoned that "the most reasonable date to fix for the value of OGSI's percentage of the warrants is April 9, 1999, the date of consummation of the BMC tender offer at a price of $52.50 in cash."

Hollander contends that the district court erred in determining that OGSI would have held the warrants for the longest term possible and improperly computed OGSI's breach of contract damages from the date of the BMC tender offer, rather than from the date of his breach. We agree that damages are properly measured from the date of the breach.

■■■ The contract provided that it would be governed by New York law. This is not disputed by either party. Under New York law, damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract. *See Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 495 (2d Cir.1995). New York courts are clear that breach of contract damages are measured from the date of the breach. *See Simon v. Electrospace Corp.,* 28 N.Y.2d 136, 145, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971); *see also Lucente,* 310 F.3d at 262. We have consistently stated that "New York's rule for '[m]easuring contract damages by the value of the item at the time of the breach is eminently sensible and actually takes expected lost future profits into account.'" *Lucente,* 310 F.3d at 262 (quoting *Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 826 (2d Cir.1990)). We have also noted that New York courts "have rejected awards based on what 'the actual economic conditions and performance' were in light of hindsight." *Sharma,* 916 F.2d at 826 (quoting *Aroneck v. Atkin,* 90 A.D.2d 966, 456 N.Y.S.2d 558, 559 (4th Dep't 1982)).

■■■ Admittedly, we have allowed damages to be measured at a later date in cases of conversion. In such cases, damages may be measured by "'the highest intermediate value of the stock between the time of the conversion and a reasonable time after the owner has received notice of it to enable him to replace the stock.'" *Schultz v. Commodity Futures Trading Comm'n,* 716 F.2d 136, 139–40 (2d Cir.1983) (quoting *Gallagher v. Jones,* 129 U.S. 193, 201, 9 S.Ct. 335, 32 L.Ed. 658 (1889)). Thus, the measure of damages in conversion of securities cases is either: (1) their value at the time of the conversion; or (2) their highest intermediate value between notice of the conversion and the time when reentry into the market would be both warranted and desired. *See id.* at 141–42.

Ours, of course, is not a conversion case. In *Lucente v. International Business Ma-*

*chines Corp.,* 310 F.3d 243, 263 (2d Cir. 2002), we flatly rejected under New York law the use of the conversion measure of damages in a breach of contract case. In *Lucente,* we examined the precedent set forth in this Circuit by *Hermanowski v. Acton Corp.,* 729 F.2d 921 (2d Cir.1984). In *Hermanowski,* the district court had puzzled over whether damages in a breach of contract action involving stock options should be calculated as of the date of the breach or under the conversion method. It rejected the latter. *Hermanowski v. Acton Corp.,* 580 F.Supp. 140, 144–45 (E.D.N.Y.1983). It applied the traditional rule that damages for breach of contract are "determined by the loss sustained or the gain prevented at the time and place of breach." *Id.* at 145 (citing *Simon,* 28 N.Y.2d at 145, 320 N.Y.S.2d 225, 269 N.E.2d 21). We affirmed "substantially for the reasons set forth in the decision of the district court" and specifically agreed that "damages should be determined as of [the] date [of the breach]." *Hermanowski,* 729 F.2d at 922. The Third Circuit reached the same result in *Scully v. U.S. WATS, Inc.,* 238 F.3d 497, 512–13 (3d Cir. 2001) (interpreting federal and New York law).

Paragraph 5(a) of the Engagement Letter provided that, upon signing the Engagement Letter, Hollander was to pay OGSI a retainer of $50,000 in cash and deliver warrants that "shall vest immediately upon signing of this Agreement." This provision entitled OGSI to acquire 25,000 shares of 4D common stock. Similar to a stock option, a warrant is defined as "any ... certificate evidencing a right to subscribe to or otherwise acquire another security, issued or unissued." 17 C.F.R. § 240.12a–4(a)(1). It is undisputed that Hollander refused to deliver the warrants. This refusal was in breach of the Engagement Letter.

■ Based on clear New York law, the proper valuation for the warrants was the date of the breach—the date Hollander failed to deliver the warrants. *See Simon,* 28 N.Y.2d at 145, 320 N.Y.S.2d 225, 269 N.E.2d 21 ("The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach ... [t]he rule is precisely the same when the breach of contract is nondelivery of shares of stock.") (internal citation omitted); *Aroneck,* 456 N.Y.S.2d at 559 ("[D]amages for the defendants' breach of contract to purchase plaintiffs' stock ... [are computed] by ascertaining the difference between the agreed price of the shares and the fair market value at the time of the breach.").

Not surprisingly, OGSI contends that it should get the benefit of the higher valuation of the warrants at the date of the tender offer because it would have held the warrants longer. In support of this valuation, the district court and OGSI rely on *Commonwealth Assocs. v. Palomar Med. Techs., Inc.,* 982 F.Supp. 205 (S.D.N.Y. 1997). In *Commonwealth,* the plaintiff was awarded the value of the underlying common stock as of the date on which the plaintiff showed that it would have sold the stock if the warrants had been issued. *See id.* at 211. The facts presented here, however, are distinguishable.

In *Commonwealth,* the breach occurred when the defendant failed to honor the plaintiff's request for registration and issuance of the shares. The plaintiff did not learn of the defendant's repudiation of the contract until that time. *See id.* Because the defendant continued to pay the plaintiff for financial consultation, the plaintiff was justified in assuming that the defendant would honor its obligation with regard to the warrants. *See id.*

In the present case, however, the relevant breach occurred when Hollander

failed to deliver the warrants. Unlike the plaintiff in *Commonwealth,* OGSI knew immediately that Hollander had breached. *Commonwealth* is simply inapposite.

. In sum, the district court erred in valuing the warrants as of the date of the consummation of the BMC tender offer. The appropriate date for measuring OGSI's damages is the date of the breach.

It is noteworthy that the Engagement Letter did not expressly require immediate physical delivery of the warrants upon signing. Rather it stated that the warrants "shall vest immediately upon signing this Agreement." There is some indication that the parties believed that the warrants were to be delivered immediately. The district court found that the Engagement Letter was breached, "shortly after the execution of the Engagement Letter." Hollander testified that the contract language stating that the warrants would vest immediately "meant that [OGSI] would receive the 25,000 warrants immediately upon signing the agreements." Craig Newman, OGSI's general counsel, testified that the warrants were due in February 1995 and that he "considered it a breach of the engagement letter when [Hollander] didn't deliver the warrants . . . ." However, the exact date of the breach—the date from which damages should be calculated—was not determined by the district court, nor was it thoroughly briefed by the parties on this appeal.

For this reason, we vacate in part and remand to the district court with instructions to determine the date of breach and to recompute OGSI's breach of contract damages accordingly.

### B. *Individual Employee Warrants*

The district court valued the warrants held by the six (6) former employees of OGSI as of January 1, 1998, the first date the warrants were exercisable. For the reasons previously discussed, the warrants in the hands of the assignees should be valued in the same way as those retained by OGSI. Thus, the date of the breach by Hollander, as determined by the district court on remand, is the appropriate date for valuation of all the warrants.

### C. *Hollander's Buy–Back Option*

Hollander contends that the district court also erred in determining that he would not have exercised his right under the Engagement Letter to buy back the warrants. Because we find that OGSI's breach of contract damages should be measured from the date of the breach, there is no need to reach this issue.

### III. *Attorneys' Fees*

■ The district court awarded attorneys' fees to OGSI based on the indemnification clause in the Engagement Letter. Hollander contends that this provision applies to third-party claims only. The district court interpreted it to include the award of fees for suits between the parties to the Engagement Letter, rather than just suits by third parties. We agree with Hollander.

■ The traditional standard of review of an award of attorneys' fees is highly deferential to the district court. Where, however, an appellant's contention on appeal regarding an award of attorneys' fees is that the district court made an error of law, "the district court's rulings of law are reviewed *de novo.*" *Baker v. Health Mgmt. Sys., Inc.,* 264 F.3d 144, 149 (2d Cir.2001).

■ We review the district court's interpretation of contracts *de novo. See Lee v. Bsb Greenwich Mortgage Ltd. P'ship,* 267 F.3d 172, 178 (2d Cir.2001). A determination that a contract is ambiguous is also subject to *de novo* review. *See Red*

*Ball Interior Demolition Corp. v. Palmadessa,* 173 F.3d 481, 484 (2d Cir.1999).

At issue on appeal is whether the indemnification provision contained in the Engagement Letter applies only to claims brought by third parties or also applies to claims brought between the parties to the agreement. The indemnification provision is found in paragraph 7(b) of the Engagement Letter and requires Hollander to:

reimburse the Advisor promptly for any legal or other expenses reasonably incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuits, investigations, claims or other proceedings arising in any manner out of or in connection with the rendering of services by the Advisor hereunder (*including, without limitation, in connection with the enforcement of this Agreement* and the indemnification obligations set forth herein).

(emphasis added).

 Under the general rule in New York, attorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule. *See Bourne Co. v. MPL Communications, Inc.,* 751 F.Supp. 55, 57 (S.D.N.Y.1990); *A.G. Ship Maint. Corp. v. Lezak,* 69 N.Y.2d 1, 5, 511 N.Y.S.2d 216, 503 N.E.2d 681 (1986); *Mighty Midgets, Inc. v. Centennial Ins. Co.,* 47 N.Y.2d 12, 21–22, 416 N.Y.S.2d 559, 389 N.E.2d 1080 (1979). This policy "provides freer and more equal access to the courts ... [and] promotes democratic and libertarian principles." *Mighty Midgets, Inc.,* 47 N.Y.2d at 22, 416 N.Y.S.2d 559, 389 N.E.2d 1080. Accordingly, while parties may agree that attorneys' fees should be included as another form of damages, such contracts must be strictly construed to avoid inferring duties that the parties did not intend to create. *See Hooper Assocs., Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 491, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989).

 Promises by one party to indemnify the other for attorneys' fees run against the grain of the accepted policy that parties are responsible for their own attorneys' fees. *See id.* at 492, 549 N.Y.S.2d 365, 548 N.E.2d 903. Under New York law, "the court should not infer a party's intention" to provide counsel fees as damages for a breach of contract "unless the intention to do so is unmistakably clear" from the language of the contract. *Id.* at 492, 549 N.Y.S.2d 365, 548 N.E.2d 903; *see also Zissu v. Bear, Stearns & Co.,* 805 F.2d 75, 79 (2d Cir.1986)(agreement did not "meet the requisite level of specificity" to support an award of attorneys' fees in a security fraud suit); *Eastman Kodak Co. v. STWB Inc.,* 232 F.Supp.2d 74, 95 (S.D.N.Y.2002) ("[t]he contractual language must evince an 'unmistakable intention' to indemnify"); *Hooper,* 74 N.Y.2d at 491–92, 549 N.Y.S.2d 365, 548 N.E.2d 903 (holding that the plaintiff could not recover attorneys' fees from the defendant without express language in the agreement permitting such a recovery); *Tokyo Tanker Co. v. Etra Shipping Corp.,* 142 A.D.2d 377, 536 N.Y.S.2d 75, 77–78 (1st Dep't 1989) (noting that an indemnity provision " 'should not be extended to include damages which are neither expressly within its terms nor of such character that it is reasonable to infer that they were intended to be covered under the contract' " (quoting *Niagara Frontier Transp. Auth. v. Tri–Delta Const. Corp.,* 107 A.D.2d 450, 487 N.Y.S.2d 428, 431, *aff'd,* 65 N.Y.2d 1038, 494 N.Y.S.2d 695, 484 N.E.2d 1047 (1985))).

OGSI bottoms its argument on the parenthetical clause it has italicized in para-

graph 7(b): all actions *"including, without limitation, in connection with the enforcement of this Agreement."*

Paragraph 7(a) of the Engagement Letter requires Hollander to indemnify OGSI for any claims, liabilities, or damages resulting from OGSI's services, unless caused by OGSI's gross negligence or willful misconduct. We read this section as referring only to third-party claims against OGSI. The next section, Paragraph 7(b), (1) refers to reimbursement of expenses in connection with such claims; (2) provides OGSI with a right to separate counsel in connection with any matters in which indemnification is sought; (3) gives Hollander the right to notice of any indemnification claim and an opportunity to assume OGSI's defense; and (4) requires Hollander to obtain the prior written consent of OGSI before settling any lawsuits. Paragraph 7(b) indisputably applies solely to third-party claims. We read paragraph 7(a) in the same light. *See Bourne,* 751 F.Supp. at 57–58 (a contract did not extend indemnification to actions between the parties when the agreement did not expressly indicate such an intention). Examining the parenthetical language in light of the surrounding provisions, it can apply only to a situation where Hollander refuses to indemnify OGSI from a third party action and not to an action commenced by OGSI against Hollander.

The New York Court of Appeals decision in *Hooper Assoc., Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989), is particularly instructive. In *Hooper,* the court was confronted with an indemnification clause that obligated the defendant to "indemnify and hold harmless [plaintiff] . . . from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees" arising out of breach of warranty claims, performance of services, and in-

fringement of patents, copyrights or trademarks. *Id.* at 492, 549 N.Y.S.2d 365, 548 N.E.2d 903 (internal quotation marks omitted) (alteration and ellipses in original). The Court of Appeals found that the indemnity clause related to third-party claims, and was neither "exclusively or unequivocally referable to claims between the parties themselves [nor] support[ed] an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract." *Id.* A finding that the indemnification clause did not reach suits between the parties was also supported "by other provisions in the contract which unmistakably relate to third-party claims." *Id.*

The court further reasoned that "[t]o extend the indemnification clause to require defendant to reimburse plaintiff for attorney[s'] fees in the breach of contract action against defendant would render these provisions meaningless because the requirement of notice and assumption of the defense has no logical application to a suit between the parties." *Id.* at 492–93, 549 N.Y.S.2d 365, 548 N.E.2d 903. Here, as in *Hooper,* construing the indemnification clause "as pertaining only to third-party suits affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect." *Id.* at 493, 549 N.Y.S.2d 365, 548 N.E.2d 903.

Accordingly, we vacate the district court's award of attorneys' fees to OGSI.

## IV. *Pre–Judgment Interest*

Because the district court improperly awarded attorneys' fees under the indemnification clause contained in the Engagement Letter there is no need to address the issue of prejudgment interest on such fees.

## CONCLUSION

For the reasons stated herein, we AFFIRM the district court's decision that it had subject matter jurisdiction, but VACATE the district court's:

1. determination that the proper date to value the damages for Hollander's failure to deliver 4D warrants was the date of the consummation of the BMC tender offer (April 9, 1999), rather than the date of breach;

2. determination that the third-party indemnification clause in the Engagement Letter permitted an award of attorneys' fees for suits between the parties; and

REMAND the case with instructions to determine the date of breach and to recompute OGSI's contract damages from that date.